UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA
*ex rel.* DONALD JOHNSON
and HAEDEUK YAE,

Plaintiffs,

v.

CHROMOLOGIC LLC and
NARESH MENON,

Defendants.

Case: 1:21–cv–02184 JURY DEMAND
Assigned To : Leon, Richard J.
Assign. Date : 8/5/2021
Description: Gen. Civil (E–DECK)

21CV _______

**FILED UNDER SEAL**
**Pursuant to 31 U.S.C. § 3730(b)(2)**

**DO NOT SERVE**

# COMPLAINT AND DEMAND FOR JURY TRIAL

## OVERVIEW

1. This is a civil action by DONALD JOHNSON and HAEDEUK YAE (“RELATORS”), each on his own behalf, and on behalf of the United States of America against defendants CHROMOLOGIC LLC (“CHROMOLOGIC”) and its chief executive officer NARESH MENON (“MENON”) (jointly, “DEFENDANTS”) under the *qui tam* provisions of the False Claims Act, 31 U.S.C. §§ 3729 *et seq.* (“FCA”), for treble damages, civil penalties, and other relief arising from DEFENDANTS’ fraud in connection with CHROMOLOGIC’s improper claims for, and receipt and retention of, monetary payments from the United States.

2. The fraudulent practices arose in connection with the Small Business Innovation Research (“SBIR”) program (and related Small Business Technology Transfer (“STTR”) program), operated by the Small Business Administration, pursuant to 15 U.S.C. § 638, as well as awards pursuant to Broad Agency Announcements (“BAAs”), administered by the United States through its agencies, the Department of Defense (“DOD”), the Department of Health and Human

Services ("HHS"), the National Aeronautics and Space Administration ("NASA") and the Department of Energy ("DOE").

3. CHROMOLOGIC, among other things, (i) submitted false and fraudulent grant applications, (ii) submitted false and fraudulent reports and other supporting materials, and (iii) submitted false and fraudulent time sheets, records and reports, and thereby improperly obtained funds from the United States in connection with the SBIR program and the BAAs. The fraudulent practices included, among other things, falsification of test data, providing materially false information to make it appear that CHROMOLOGIC satisfied the criteria for issuance of the grants, when in fact it did not, and providing false time sheets, records and reports to make it appear either that CHROMOLOGIC employees worked on particular grant projects when in fact they had not, or to fraudulently overstate the hours that CHROMOLOGIC employees actually worked on particular grant projects.

4. As a result of such practices, CHROMOLOGIC has falsely and fraudulently sought, obtained and retained SBIR funds, the precise amount of which will be determined at trial.

## PARTIES AND ENTITIES

5. The United States, through its agencies, the Small Business Administration ("SBA"), the Department of Defense ("DOD"), the Department of Health and Human Services ("HHS"), the National Aeronautics and Space Administration ("NASA") and the Department of Energy ("DOE"), is the real party in interest in this *qui tam* action. The headquarters of these agencies are all located in the District of Columbia at the following addresses: SBA, 409 Third Street, SW, Washington, D.C. 20416; DOD, 1400 Defense Pentagon, Washington, D.C. 20301-1400; DOE, 1000 Independence Avenue, SW, Washington, D.C. 20210; and NASA, 300 Hidden Figures Way, SW, Washington, D.C.

6. RELATOR DONALD JOHNSON ("JOHNSON") is a natural person who currently resides in the State of California. At times relevant to this Complaint, JOHNSON was an employee of CHROMOLOGIC. JOHNSON is a scientist and worked directly on many of the projects for which CHROMOLOGIC sought SBIR funding. More specifically, JOHNSON served at times as a principal investigator ("PI"), support scientist to other PIs, and reviewer of other persons' grant applications.

7. RELATOR HAEDEUK YAE ("YAE") is a natural person who currently resides in the State of California. At times relevant to this Complaint, Yae was an employee of CHROMOLOGIC. Yae is a software engineer and worked in a number of roles at CHROMOLOGIC, including as principal software engineer, facilities manager, IT manager, and in security.

8. DEFENDANT CHROMOLOGIC, founded in 2003, is a limited liability company organized under the laws of the State of California. Its principal place of business is 1225 S Shamrock Avenue, Monrovia, California 91016.

9. DEFENDANT NARESH MENON is a natural person who, upon information and belief, resides in Los Angeles County, California and is the manager, chief executive officer and sole or principal owner of CHROMOLOGIC. According to biographical information submitted in connection with SBIR grant applications, MENON holds a Ph.D. in Physics from Purdue University and served as a visiting fellow at Cornell University for four years.

## JURISDICTION AND VENUE

10. The court has subject matter jurisdiction over the FCA claims alleged in this complaint under 28 U.S.C. §§ 1331 (federal question) and 1345 (United States as plaintiff), as well as 31 U.S.C. § 3732(a) (False Claims Act).

11. The court has personal jurisdiction over each Defendant pursuant to 31 U.S.C. § 3732(a) because an act proscribed by 31 U.S.C. § 3729 occurred in this district. Section 3732(a) further provides for service of process at any place within or outside the United States.

12. Venue is proper in this district pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. § 1391 because an act proscribed by 31 U.S.C. § 3729 occurred within this district; and a substantial part of the events or omissions giving rise to the claims alleged in this complaint occurred in this district.

## FCA SUBJECT MATTER JURISDICTION

13. Upon information and belief, none of the subject matter or other jurisdictional bars set forth in the FCA are applicable to this action.

14. Upon information and belief, prior to any "public disclosure" (as defined by the FCA), RELATORS voluntarily disclosed to the United States Attorney's Office for the District of Columbia, and/or the United States Attorney's Office for the Central District of California, the information upon which the allegations or transactions in this complaint are based.

15. Through their employment at CHROMOLOGIC, each RELATOR is an "original source" of the information on which these allegations are based, within the meaning of the FCA.

## FCA DAMAGES, PENALTIES AND AWARDS FOR FALSE CLAIMS

16. The FCA imposes liability on any person violating § 3729(a)(1) to the United States Government as follows: a civil penalty of not less than $5,500 and not more than $11,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. § 2461 note; Public Law 104–410), plus three (3) times the amount of damages which the Government sustained because of the act of that person. 31 U.S.C. § 3729(a)(1).

17. Where the Government proceeds with an action commenced by the filing of a *qui tam* complaint and recovers money from a defendant under § 3729, the person who initiated the action (the "relator") may receive up to twenty-five percent (25%) of the proceeds. Where the Government does not proceed with such an action and the relator pursues it on his/her own and recovers proceeds from a defendant under § 3729, the relator may receive up to thirty percent (30%) of the proceeds. In either case, the relator is also entitled to an award against the defendant for the amount of all reasonable expenses, attorneys' fees and costs. 31 U.S.C. § 3730(d).

## RELEVANT FCA DEFINITIONS

18. For purposes of the FCA, "claim" means any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that (i) is presented to an officer, employee, or agent of the United States; or (ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government (I) provides or has provided any portion of the money or property requested or demanded; or (II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded. 31 U.S.C. § 3729(b)(2)(A).

19. For purposes of the FCA, "knowing" and "knowingly" means that a person, with respect to information: (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information, and no proof of specific intent to defraud is required. 31 U.S.C. § § 3729(b).

20. For purposes of the FCA, "obligation" means an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee

relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment. 31 U.S.C. § 3729(b)(3).

21. For purposes of the FCA, "material" means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property. 31 U.S.C. § 3729(b)(4).

## THE SBIR PROGRAM

22. The SBIR program (sometimes referred to as the "Program") was created by the Small Business Innovation Development Act of 1982 to support small businesses and promote free competition, which Congress recognized as "basic not only to the economic well-being but to the security of this Nation," 15 U.S.C. § 638(a), and reauthorized until September 30, 2000, by the Small Business Research and Development Enhancement Act (P.L. 102-564), and reauthorized again until September 30, 2008, by the Small Business Reauthorization Act of 2000 (P.L. 106-554). After a series of continuing resolutions, the SBIR program was reauthorized by the SBIR/STTR Reauthorization Act of 2011 through FY 2017 (P.L. 112-81), Congress has further modified and extended the SBIR program through 2022 as part of the 2018 National Defense Authorization Act (P.L. 115-91).

23. The goal of the Program is to provide the Government with new and cost effective solutions to complex scientific and technical problems, while also encouraging small businesses to market such technology in the private sector, thereby helping to stimulate the U.S. economy. Reauthorizing legislation, which extended the program through September 30, 2008, found that the SBIR program was "highly successful in involving small businesses in federally funded research and development." P.L. 106-554, §1(a)(9) (Dec. 21, 2000).

24. The SBIR statute, 15 U.S.C. § 638, establishes a system for channeling federal monies to for-profit small businesses engaged in scientific and/or engineering research or research

and development. The goal is for these small businesses to take seed money from the Government and develop useful technology that ultimately can be sold by the small businesses in the market place for a significant profit.

25. Under the SBIR program, federal agencies with extramural research and development ("R&D") budgets over $100 million are required to administer SBIR programs using an annual set-aside of 3.2% (since FY 2017). 15 U.S.C. § 638(f). Currently, the SBIR program solicitations are issued by eleven Federal agencies, namely, the Department of Agriculture, the Department of Commerce, the Department of Defense, the Department of Education, the Department of Energy, the Department of Health and Human Services, the Department of Homeland Security, the Department of Transportation, the Environmental Protection Agency, the National Aeronautics and Space Administration, and the National Science Foundation. Over $10 billion has been awarded by the SBIR program to various small businesses.

26. The SBIR statute provides that each agency is to distribute SBIR funds to small business concerns by unilaterally (1) determining suitable projects and research topics within its SBIR program, (2) issuing small business innovation research solicitations, (3) receiving and evaluating proposals, and (4) awarding grants to qualified participants. 15 U.S.C. § 638(g). The actual payment of monies to an awardee is accomplished via a "funding agreement" between the awarding agency and the small business. 15 U.S.C. §§ 638(e)(3) and (g)(4)-(7). Among other things, the funding agreement sets out a schedule for the distribution of funding, which is tied to the achievement of certain performance milestones. 15 U.S.C. § 638(g)(7).

27. The SBIR Program comprises three distinct contract phases. Phase I contracts determine the feasibility of new technology and as of November 2020, are awarded in amounts up to $259,613. They are awarded for research lasting six months or less. Phase II contracts are

awarded only to successful Phase I participants and are based on Phase I results. Phase II contracts are not only for continuing research on scientific and technical issues but are also for determining the potential commercial applications of new technology and products ("commercialization"). Phase II contracts typically are for terms of approximately two years and as of November 2020 are awarded in amounts up to $1,730,751. Phase III involves private sector or non-SBIR federal agency funding to patent, market, license, manufacture, or in other ways, commercialize Phase II projects.

28. SBIR contracts are competitively awarded based on not only scientific and technical merit but also potential commercialization. Panels of scientists and engineers evaluate proposals. Among other things, in recommending the awarding of contracts these evaluators consider the relevant qualifications of the principal investigator ("PI") and key personnel, including, but not limited to their formal academic credentials and employment history, the soundness and technical merit of the proposed approach, the potential commercial applications of the project and the likelihood that the proposed research will fulfill the requirements of the topic or problem the awarding agency sought to be addressed.

29. Each awarding agency promulgates its own set of SBIR regulations and instructions and distributes its own forms. Most, if not all, of these rules and documents are available on the awarding agency's web site.

30. The SBIR.gov website provides tutorials on accounting practices for grant award recipients. According to that website, "[t]he expectations regarding the sophistication of a small business accounting system changes between Phase 1 and Phase II." That is because a Phase I award involves less money and is usually a firm fixed price award, meaning the recipient is required to perform the work necessary in exchange for the grant amount.

SBIR.gov/tutorials/accounting-finance/tutorials2#; see also 48 C.F.R. § 16.202 (discussing firm fixed price contracts).

31. Phase II awards on the other hand usually require SBIR grant recipients to move to a cost plus fixed fee ("CPFF") accounting system which allows them to track the cost of each grant and distinguish those costs from one project to another, as well as to distinguish direct and indirect costs. See 48 C.F.R. § 16.306 (discussing cost plus fixed fee contracts). Because the government will generally only pay award recipients in Phase II based on the documented costs of doing the Phase II work, they must accurately reflect those costs, of which labor is the most common type. SBIR.gov/tutorials/accounting-finance/tutorials2#.

32. In order for SBIR grant recipients in Phase II to accurately reflect their labor costs, each employee of the small business must keep an accurate timesheet, regardless of whether they perform work that is billable to a specific grant project or not. *See* Defense Contract Audit Agency (DCAA) Manual No. 7641.90 *Information for Contractors*, Enclosure 2, Section 4 at p. 16 (requiring companies to keep detailed instructions for timesheet preparation through a timekeeping manual and/or company procedure indicating that the employee is responsible for "the correct distribution of time by project numbers, contract number or name, or other identifiers for a particular assignment" and for "recording all hours worked whether they are paid or not"). Those timesheets must "list separately each contract, grant and other directly billed projects of the company on which the employee is working," and must be reviewed by a company supervisor. SBIR.gov/tutorials/accounting-finance/tutorials2#; *see also* DCAA Manual No. 7641.90, Enclosure 2, Section 4 at p. 16 (stating that "the supervisor should approve and cosign all timesheets" and that the "guidance should state that the nature of work determines the proper distribution of time, not availability of funding, type of contract, or other factors."); *see also* SF

1408 Preaward Survey of Prospective Contractor Accounting System (including "identification and accumulation of direct costs by contract" as one of the requirements by which DCAA evaluates a company's accounting system).

**BAAS AND THE FEDERAL ACQUISITION REGULATION**

33. A BAA is a tool for acquisitions pursuant to the Federal Acquisition Regulation ("FAR"), codified at Parts 1 through 58 of Title 48 of the Code of Federal Regulations. As defined in the FAR, a BAA "means a general announcement of an agency's research interest including criteria for selecting proposals and soliciting the participation of all offerors capable of satisfying the Government's needs." (FAR 2.101.) FAR 6.102(d)(2) further clarifies the use of a BAA for "[c]ompetitive selection of basic and applied research and that part of development not related to the development of a specific system."

34. An agency's use of a BAA in connection with research grants is governed, in part, by the requirements of FAR 35.016 and the other applicable FARs.

35. Individual agencies can also impose requirements with respect to BAAs and contracts awarded pursuant to them.

36. The NIH, for example, has issued a Policy Manual with respect to BAAs setting out procedures in addition to those set out in the FAR ("NIH BAA Manual"). The NIH BAA Manual provides, for example, that "proposals received in response to a BAA shall be evaluated by the peer review process as established at 42 U.S.C. § 289a, 42 CFR Part 52h, NIH Manual Chapters 6315-1 and 7410 and in accordance with the established technical evaluation criteria in the BAA."

## FACTUAL ALLEGATIONS

## GENERALLY

37. CHROMOLOGIC holds itself out as a company focused on research and commercialization of programs.

38. MENON runs the day-to-day operations of CHROMOLOGIC and has varying levels of involvement in each of the SBIR and BAA programs for which CHROMOLOGIC seeks SBIR funding.

39. CHROMOLOGIC employs scientists (including, at times relevant to this complaint, RELATORS JOHNSON and YAE) who act as the PI on given programs and/or who offer research and other technical support to the PIs. CHROMOLOGIC's scientists, including RELATOR JOHNSON, also participate in drafting and/or reviewing grant applications, reports and other submissions to government agencies, and they communicate and participate in grant-related meetings with CHROMOLOGIC and/or agency personnel.

40. CHROMOLOGIC engaged in fraudulent practices with respect to the SBIR program and the BAAs by securing Phase I and Phase II SBIR and BAA grants through materially false and misleading statements and omissions in submissions and statements to various federal agencies.

41. MENON orchestrated the fraudulent submissions, directly and through subordinates, by, among other things, (i) creating or directing others to falsify test data; (ii) copying or directing others to copy from other sources test data and to falsely represent that CHROMOLOGIC had achieved the test results; (iii) falsely representing the commercial viability of products; (iv) falsely representing CHROMOLOGIC's intention to perform research steps; and (v) making false statements to federal agency officials.

42. Upon information and belief, the false statements and omissions were material to the agencies' decisions to issue SBIR and BAA grants to CHROMOLOGIC.

43. In furtherance of the fraudulent practices, among other acts, MENON and his agents directed CHROMOLOGIC personnel (including RELATOR JOHNSON) to misrepresent, falsity and omit data and to make materially false statements and omissions, all to deceive the government agencies from which CHROMOLOGIC was seeking funds.

44. In a similar vein, MENON and his agents directed CHROMOLOGIC personnel (including RELATOR JOHNSON) to falsify the commercialization prospects of the programs for which the company was seeking SBIR funding.

45. MENON created an atmosphere of fear, based on threats and bullying toward CHROMOLOGIC personnel who questioned his tactics or refused to comply.

46. Through MENON's tactics, CHROMOLOGIC procured some fifty-six SBIR grants from in or around 2012 through the present, as well as numerous BAA grants. Upon information and belief, SBIR and BAA grants constitute the vast majority of CHROMOLOGIC's revenue, with only a small amount of revenue from programs that it actually succeeded in commercializing. In other words, CHROMOLOGIC is what is known in SBIR parlance as an "SBIR mill."

47. MENON and his agents directed CHROMOLOGIC supervisors to demand that each of the approximately 30 employees submit a signed completed timesheet by noon on every other Friday. Those timesheets were distributed to employees on open company software, and each employee was assigned a password by the company to access their timesheets. Each timesheet contained a pre-allocated budget summary on the bottom right corner listing the specific SBIR grant projects the employees were supposed to allocate time toward for the past two weeks and

stating the total amount of time that employees were supposed to list for that project. The amount of time for all projects listed in the pre-allocated budget summary always totaled 80 hours. Employees were required to record time to specific SBIR grant projects regardless of whether they worked on those projects or not and were required to account for 40 hours of time per week regardless of whether they worked that many hours on a specific SBIR grant project or not, thus resulting in the falsification of employee timesheets. MENON and CHROMOLOGIC presented those falsified employee timesheets to Government agencies for payment and were paid.

48. In the fall of 2016, CHROMOLOGIC held a company-wide training in which employees were instructed to spread out the required 80 hours into their time sheets according to the directed time allocations by their supervisors, as opposed to their actual time allocations on various projects. In other words, employees were instructed to fill out time sheets to reflect what their supervisors told them, and not what they actually did. This training was led by the VP of Financing, Theresa Nguyen. YAE and the VP of Operations Jim Axtelle both attended this training.

49. CHROMOLOGIC supervisors and employees often delivered employee timesheets to employees that were already filled out without regard to their accuracy and employees were instructed to sign them, as is. Sometimes supervisors would explain the need for specific false entries by stating, for example, that a grant award might be near expiration and CHROMOLOGIC wanted to use all of the time allocated to that grant before it expired, regardless of whether the employee actually worked on that grant project or not, or actually worked the number of hours attributed to that grant project or not.

50. Employees were also instructed not to accurately record time they spent on indirect costs, but rather to bill that time to a particular grant project, as if it were a direct cost attributable to a specific grant project.

51. At various times relevant to this complaint, JOHNSON was instructed by his supervisors and other employees at CHROMOLOGIC to falsify timesheets to indicate that he had performed work on various CHROMOLOGIC grant projects when he had not.

52. At various times relevant to this complaint, Yae was instructed by his supervisors and other employees at CHROMOLOGIC to falsify timesheets to indicate that he had performed work on various CHROMOLOGIC grant projects when he had not.

## SPECIFIC EXAMPLES

53. DEFENDANTS engaged in these fraudulent practices with respect to numerous SBIR and BAA grants. The following are some examples:

### A. CERETREC

54. CHROMOLOGIC engaged in fraud in connection with an SBIR grant for a program called CERETREC, awarded by the Department of Defense, Defense Health Program, a project for which RELATOR JOHNSON was the PI.

55. The Phase I award in the amount of $149,824 was granted with an award start date of September 25, 2017, and a contract number of W81XWH-17-C-0221. The Phase II award in the amount of $999,986 was granted with an award start date of August 27, 2018, and a contract number of W81XWH-17-C-0358.

56. CERETREC involved the creation of a cerebral trauma recovery drug delivery system.

57. In the Phase II application, CHROMOLOGIC falsely represented its intention to complete various animal studies to determine the best formulation for efficacy and safety studies.

58. In fact, upon information and belief, CHROMOLOGIC had no intention of completing the studies as its represented it would and has not completed the studies as it represented it would.

**B. MIDOS/MIRAD**

59. CHROMOLOGIC engaged in fraud in connection with SBIR grant for programs called MIDOS and MIRAD, awarded by the NIH, National Institute of Allergy and Infectious Diseases.

60. For MIDOS, a project on which RELATOR JOHNSON was a support scientist, the BAA award Phase I award in the amount of $1,751,981 was granted with an award date of February 28, 2017, and a project number of HHSN272201700012C.

61. MIDOS involved the creation of a micro RNA-based tissue-specific radiation biodosimiter. Its function was to "measure the concentration of circulating micro RNA (miRNA) . . . and provide tissue specific radiation biodosimitry."

62. For MIRAD, a project for which RELATOR JOHNSON was a grant application reviewer, the Phase I award in the amount of $299,968 was granted with an award start date of June 1, 2014, and a project number of 1R43AI108019-01A1, with a 2015 award in the amount of $285,587 and a project number of 5R43AI108019-02. The Phase II award in the amount of $999,884 was granted with an award start date of September 5, 2018, and a project number of 2R44AI108019-03, with a 2019 award in the amount of $1,000,000 and a project number of 5R44AI108019-04.

63. MIRAD's function is essentially the same as MIDOS, namely, to "measure changes in microRNA biomarkers in a patient's blood for diagnosis of" acute radiation syndrome. While MIDOS was to report as to the existence of biomarkers, MIRAD was to measure the concentrations of the biomarkers.

64. In the Phase II grant application for MIRAD, CHROMOLOGIC knowingly re-used the data from MIDOS and falsely represented it as data generated in connection with MIRAD.

**C. MAGTAT**

65. CHROMOLOGIC engaged in fraud in connection with an SBIR grant for a program called MAGTAT, short for Magnetically Targeted Therapeutics (MagTaT) system, awarded by the U.S. Army, Medical Research.

66. For MAGTAT, a project where RELATOR JOHNSON began as a support scientist and later became the PI, the Phase I award was granted with a contract signature date of September 28, 2016, and a contract number of W81XWH16C0181 in the amount of $99,971.86.

67. MAGTAT involved the development of "an orally administered nanoparticle formulation" for management of pain from Peripheral Neuropathy.

68. In connection with the Phase II work on the project, RELATOR JOHNSON advised that additional testing was required to develop data on toxicity. MENON said that they would instead utilize their existing data. Upon information and belief, at MENON's direction, the Director of Biomedical Solutions altered the existing data regarding toxicity.

69. As a result, the reports submitted to the Department of Defense included falsified data, including, but not limited to, Figure 2-3 and the corresponding discussion in Report No. 4 for Phase I and Figure 2-3 and the corresponding discussion in Report No. 5 for Phase II.

70. Upon information and belief, this falsified data was incorporated into the Phase II application.

**D. OPPAH**

71. CHROMOLOGIC engaged in fraud in connection with an SBIR grant for a program called Ocular Penetrating/Perforating injuries Assessment Hydrogel system ("OPPAH"), awarded by the Department of Defense, Defense Health Program.

72. For OPPAH, a project for which RELATOR JOHNSON was a support scientist, the Phase I award was granted in the amount of $149,957 with an award start date of December 17, 2018, and a contract number of W81XWH19C0001.

73. OPPAH involved the development of a test administered by a medic at Role of Care Level One to detect the presence of penetrating ocular injury.

74. RELATOR JOHNSON was originally selected as the PI on OPPAH. When RELATOR protested that what was set out in certain work set out in the draft Phase I application would not work, MENON replaced RELATOR as PI.

75. Upon information and belief, at MENON's direction CHROMOLOGIC submitted a Phase II application for OPPAH that included misrepresented data about the testing that had been completed and falsified data.

**E. SYNFACT**

76. CHROMOLOGIC engaged in fraud with respect to an SBIR grant for a program called SYNFACT, awarded by the Department of Defense, Defense Health Program.

77. For SYNFACT, a project on which RELATOR JOHNSON was the PI and wrote the grant application and various progress reports, the Phase I award in the amount of $149,950 was granted with an award start date of September 15, 2017, and a contract number of W81XWH-

17-C-0197. The Phase II award in the amount of $999,912 was granted with an award date of September 24, 2018, and a contract number of W81XWH18C0094.

78. SYNFACT involved the development of synthetically formulated anatomically correct tissues.

79. In the Phase I application, CHROMOLOGIC falsely represented its intention to carry out the specifications of contract performance and goals.

80. CHROMOLOGIC made false statements in reports in connection with the Phase II work. For example, CHROMOLOGIC misrepresented in Section 4.0 of its Phase II Report No. 5 its intention to complete the work set out therein.

**F. THERASPEC**

81. CHROMOLOGIC engaged in fraud with respect to an SBIR grant for a program called THERASPEC, awarded by the Department of Defense, Defense Health Agency.

82. For THERASPEC, a project for which RELATOR JOHNSON was a support scientist, the Phase I award was granted. The Phase II award in the amount of $999,988 was granted with an award start date of September 25, 2015, and a contract number of W81XWH-15-C-0127.

83. THERASPEC involved a spectroscopic system for therapeutic drug monitoring. As set forth in CHROMOLOGIC's Phase I SBIR application, the intended product was "a point-of-care (POC) in vitro diagnostic device that quantifies antibiotics and antifungals circulating in blood plasma using Raman Spectroscopy."

84. RELATOR JOHNSON was asked to participate in the Phase II for THERASPEC. After becoming involved, he learned that the person who had prepared the Phase I submission had been forced to make up data.

85. RELATOR JOHNSON learned that in the Phase I application, the PI had plagiarized test data from other tests.

86. In addition, in the Phase I reports, CHROMOLOGIC submitted falsified data relating to concentrations of the proteins in the blood. Specifically, CHROMOLOGIC, at MENON's direction, performed the test on concentrations after they had passed the blood through a sieve and eliminated the vast majority of proteins.

87. RELATOR JOHNSON and others protested the presentation of the falsified data in connection with the Phase II submission. Nonetheless, MENON overrode the objections and authorized the submission of the falsified data.

**G. BAID**

88. CHROMOLOGIC engaged in fraud with respect to an SBIR grant for a program called BAID, awarded by the Department of Defense, U.S. Army branch.

89. For BAID, a project for which RELATOR JOHNSON reviewed grant applications and reports prepared by others, the Phase I award was granted with an award in the amount of $99,959.45, an award date of January 18, 2018, and a contract number of W81XWH-18-C-0011. The Phase II award in the amount of $499,963.28 was granted with an award date of May 7, 2019, and a contract number of W81XWH-19-C-0066.

90. BAID involved the development of a biometric identification and access management system. The intended users were medical personnel and patients in situations with intermittent network access.

91. RELATOR JOHNSON learned that much of the information in the Phase I reports was falsified.

92. Similarly, RELATOR JOHNSON learned that the Phase I option reports included falsified results and outcomes information. Indeed, the PI on the project admitted to RELATOR that he had to make up data for the project. This was because the persons involved in this grant kept losing sight of when reports were due and they had to make up results and outcomes when, in fact, no work had been done on the project.

## H. FALSIFIED TIMESHEETS

93. RELATOR JOHNSON was instructed by his supervisors and others at CHROMOLOGIC to falsify timesheets to indicate that he had performed work on various CHROMOLOGIC grant projects when he had not. This included false time entries on records for the following six grant projects— Biovoto, Unitrac, Ocosmo, OFAM, Flocop and MIDOS. Notably, JOHNSON was neither responsible for, nor performed any work on, the Biovoto, Unitrac, Ocosmo, OFAM and Flocop projects whatsoever.

94. RELATOR YAE was instructed by his supervisors and others at CHROMOLOGIC to falsify timesheets to indicate that he had performed work on various CHROMOLOGIC grant projects when he had not. This included false time entries on records for the following four grant projects—Ofam II, Quantek, G&A, and UCLA. Notably, YAE was neither responsible for, nor performed any work on, the Ofam II and UCLA projects whatsoever.

## COUNT I

### FCA VIOLATIONS
### (31 U.S.C. §§ 3729(a)(1)(A), (B), (C) and (G))

95. RELATORS reallege all the allegations in this complaint as if fully set forth herein.

96. This is a claim for treble damages and penalties under the FCA, as amended on May 20, 2009.

97. Through the acts described above and otherwise, CHROMOLOGIC and MENON, by and through their agents and employees: (i) knowingly presented, or caused to be presented, a false or fraudulent claim for payment or approval; (ii) knowingly made, used, or caused to be made or used, a false record or statement material to a false or fraudulent claim; (iii) conspired to commit a violation of the FCA; and, (iv) knowingly made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the Government, all in violation of 31 U.S.C. §§ 3729(a)(1)(A), (B), (C) and (G).

98. Upon information and belief, the Government was unaware of the falsity of the records, statements, and claims made or submitted by CHROMOLOGIC and MENON.

99. Upon information and belief, the false and fraudulent representations and claims CHROMOLOGIC and MENON made to the Government were material to the Government's decisions to make payments to CHROMOLOGIC.

100. Upon information and belief, had the Government known of the false or fraudulent nature of DEFENDANTS' representations and claims, it would not have made the payments to CHROMOLOGIC.

101. By reason of DEFENDANTS' violations of the FCA, the United States has suffered economic loss.

**PRAYER FOR RELIEF**

WHEREFORE, RELATORS, each on behalf of himself, and on behalf of and in the name of the United States, demands judgment against CHROMOLOGIC and MENON as follows:

A. On Count I:

1. Ordering CHROMOLOGIC and MENON to cease and desist from violating the FCA, 31 U.S.C. §§ 3729 *et seq*.

2. A money judgment against CHROMOLOGIC and MENON in the amount of three times the damages the United States has sustained because of DEFENDANTS actions, plus a civil penalty of $11,000 for each act by CHROMOLOGIC in violation of the FCA, as provided by 31 U.S.C. § 3729(a).

3. Awarding RELATORS the maximum relator's share available under the FCA, for bringing Count I, namely, 25 percent of the proceeds of the action by judgment or settlement of the claim if the Government intervenes in the matter (or pursues its claim through any alternate remedy available to the Government, 31 U.S.C. § 3730(c)(5)), or, alternatively, 30 percent of the proceeds of the action by judgment or settlement of the claim, if the Government declines to intervene, as provided in 31 U.S.C. § 3730(d).

4. Awarding RELATORS all reasonable expenses that were necessarily incurred in prosecution of this action, plus all reasonable attorneys' fees and costs, as provided by 31 U.S.C. § 3730(d); and

5. Interest on money judgments, as provided by law; and

6. For such other relief for the United States and RELATORS as the Court deems appropriate.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38, RELATORS hereby demand trial by jury.

Dated: Washington, D.C.
August 5, 2021

COHEN SEGLIAS PALLAS
GREENHALL & FURMAN

By: /s/Julie A. Grohovsky
Julie A. Grohovsky (D.C. Bar # 412 566)
900 Seventh Street, NW
Suite 725
Washington, D.C. 20001
Tel: (202) 466-4110
Fax: (202) 466-2693
Email: jgrohovsky@cohenseglias.com

McINNIS LAW

By: /s/Timothy J. McInnis
Timothy J. McInnis
521 Fifth Avenue, 17th Floor
New York, NY 10175
Tel: (212) 292-4573
Fax: (212) 292-4574
Email: tmcinnis@mcinnis-law.com
[pro hac vice application to be filed]

*Attorneys for Relators*

***DO NOT SERVE***
***FALSE CLAIMS ACT COMPLAINT FILED UNDER SEAL***