McINNIS LAW
Timothy J. McInnis [7151]
*(pro hac vice)*
521 Fifth Avenue, 17th Floor
New York, NY 10175
Tel:(212) 292-4573
Fax: (212) 292-4574
Email: tmcinnis@mcinnis-law.com

Mark Allen Kleiman [115919]
KLEIMAN RAJARAM
12121 Wilshire Blvd., Ste. 810
Los Angeles, CA 90025
Telephone: (310) 392-5455
Facsimile: (310) 306-8491
E-mail: mark@krlaw.us

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA ex rel. DONALD JOHNSON and HAEDEUK YAE,<br><br>Plaintiffs,<br><br>v.<br><br>CHROMOLOGIC LLC and NARESH MENON,<br><br>Defendants. | Case No.: 2:24-cv-06749-PA-JPR<br><br>FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL |

## OVERVIEW OF ALLEGATIONS[1]

1. This is a civil action by DONALD JOHNSON ("JOHNSON") and HAEDEUK YAE ("YAE") (jointly, "RELATORS"), each on his own behalf, and on behalf of the United States of America ("UNITED STATES") against defendants CHROMOLOGIC LLC ("CHROMOLOGIC") and its owner and chief executive officer NARESH MENON ("MENON") (jointly, "DEFENDANTS") under the *qui tam* provisions of the False Claims Act, 31 U.S.C. §§ 3729 *et seq.* ("FCA"), for treble damages, civil penalties, and other relief arising from DEFENDANTS' fraudulent conduct in connection with CHROMOLOGIC's improper claims for, and receipt and retention of, monetary payments from, the United States.

2. DEFENDANTS' alleged fraudulent practices arose through their participation in the Small Business Innovation Research ("SBIR") Program, operated by the Small Business Administration ("SBA"), pursuant to 15 U.S.C. § 638, as well as awards pursuant to Broad Agency Announcements ("BAAs"), administered by the United States through four of its funding agencies: the Department of Defense ("DOD"), the Department of Health and Human Services ("HHS")/National Institutes of Health ("NIH"), the National Aeronautics and Space Administration ("NASA") and the Department of Energy ("DOE").

3. Specifically, as claimed in Counts I and II, through MENON and other employees, CHROMOLOGIC, committed research fraud by submitting to the Government false and fraudulent SBIR grant applications (also known as "proposals") and subsequent interim and final progress reports and other supporting materials, as well as by making *ad hoc* false oral statements to funding agency representatives ("Research Fraud").

4. Similarly, as claimed in Count III and IV, through MENON and other employees, CHROMOLOGIC committed time accounting fraud by submitting to the Government false and fraudulent timesheets, certifications, records and reports, as well as

[1] The headings in this complaint are merely for organizational convenience. They are not themselves allegations. Further, all allegations under a particular heading may be incorporated and realleged in other sections where appropriate.

making false *ad hoc* oral statements to funding agency representatives ("Timesheet Fraud").4

5. As a result of the Research Fraud and Timesheet Fraud activities and practices alleged in this complaint, MENON and CHROMOLOGIC improperly and unlawfully sought, received and retained funds from the United States through the SBIR Program and the BAAs, the precise amount of which will be determined at trial.

**PARTIES, PERSONS AND ENTITIES**

6. The United States, through its affected agencies, the SBA, DOD, HHS/NIH, NASA and DOE, is the real party in interest in this *qui tam* action.

7. The headquarters of the affected agencies are all located in the District of Columbia at the following addresses: SBA, 409 Third Street, SW, Washington, D.C. 20416; DOD, 1400 Defense Pentagon, Washington, D.C. 20301-1400; HHS/NIH, 200 Independence Avenue S.W. Washington, D.C., 2020; NASA, 300 Hidden Figures Way, SW, Washington, D.C.; and DOE, 1000 Independence Avenue, SW, Washington, D.C. 20210.

8. RELATOR JOHNSON is a natural person who currently resides in the State of California. Johnson holds a Ph.D. in Chemistry, which he obtained from University of California, San Diego. From September 2016 to March 2019, JOHNSON was a lead scientist at CHROMOLOGIC. In that capacity, JOHNSON worked directly on many of the projects for which CHROMOLOGIC sought SBIR funding. More specifically, JOHNSON served at times as a principal investigator ("PI"), support scientist to other PIs, and reviewer of other employees' grant applications and research reports. JOHNSON was directly involved in each of the specific SBIR-awarded grant contracts cited in this complaint as examples of DEFENDANTS' Research Fraud activities, including personally making false statements in progress reports filed with awarding agencies. Additionally, at times, JOHNSON falsified timesheets for SBIR grant awards and contracts. All of the foregoing was at the express direction of MENON and/or other CHROMOLOGIC

//

employees who, in turn, were acting at the behest of MENON and/or other CHROMOLOGIC supervisors, managers and executives.

9. RELATOR YAE, who goes by the first name "Robert," is a natural person who currently resides in the State of California. YAE holds a B.A. in Computer Science and an M.S. in Medical Computer Science. From 2015 to 2021, Yae was the principal software engineer at CHROMOLOGIC. In that capacity he performed a number of functions, including principal software engineer, facilities manager, IT manager, and assistant to security/safety officer. YAE was involved in some of the Timesheet Fraud activities alleged in this complaint. Among other things, YAE falsified timesheets for SBIR grant awards and contracts. He did so at the behest of MENON and/or other CHROMOLOGIC supervisors, managers and executives.

10. DEFENDANT CHROMOLOGIC, founded in 2003, is a limited liability company organized under the laws of the State of California. Its principal place of business is 1225 S. Shamrock Avenue, Monrovia, California 91016. Its main telephone number is (626) 381-9974. CHROMOLOGIC is organized into two units: the Biomedical Solutions Group and the Industrial Solutions Group. Its business consists primarily in obtaining research grant awards and contracts from the United States SBIR Program and performing related research in a laboratory setting. Approximately, 95% of CHROMOLOGIC's revenues come from SBIR awards and contracts. Since 2007, CHROMOLOGIC has been awarded at least 82 SBIR grant contracts. See SBIR.gov.[2] CHROMOLOGIC typically employs approximately between 35 and 45 people at any given time, approximately 85% of whom are research scientists who serve very short tenures (averaging two years or less) with the company. The majority of CHROMOLOGIC'S scientists are non-U.S. citizens who toil under MENON's pressure and sway because of their foreign alien status. CHROMOLOGIC's Unique Entity I identifier ("UEI") for doing business with the Government is D9EVNTKKWLF3.

[2] These include SBIR Phase I and Phase II awards from the following funding agencies: HHS (NIH and CDC); DOD (Army, Missile Defense, Navy, USAF, DHA, DARPA, DLA ), NASA

11. DEFENDANT MENON is a natural person who resides at 887 Monarch Dr, La Canada Flintridge, CA 91011-4105, and is the daily manager, chief executive officer and sole or principal owner of CHROMOLOGIC. According to biographical information submitted in connection with SBIR grant applications, MENON holds a Ph.D. in Physics from Purdue University and served as a visiting fellow at Cornell University for four years. MENON was personally and actively engaged in the Research Fraud and Timesheet Fraud misconduct alleged in this Complaint. Additionally, he oversaw and directed the improper and unlawful activities of other CHROMOLOGIC employees who engaged in these fraudulent schemes.

12. At all times relevant to this action, non-party Claude J. Rogers ("Rogers") was the Director of the Biomedical Solutions Group at Chromologic. In that capacity he oversaw and participated in all SBIR-related research activities and the preparation of all government submissions. Rogers was Menon's right-hand man and eyes, ears and mouthpiece when it came to all SBIR awards and contracts in the Biomedical Solutions Group, including the specific SBIR awards and contracts cited in this complaint and the Research Fraud that occurred on them.

13. At all times relevant to this action, non-party Jim Axtelle ("Axtelle") was the Vice President of Operations at Chromologic. In that capacity he managed all SBIR research projects and oversaw the creation, storage and transmission of all related documentation, including proposals, progress reports, invoices and timesheets.

14. At all times relevant to this action, non-party Theresa Nguyen ("Nguyen") was Vice President of Finance and Administration at Chromologic. In that capacity she was Menon's trusted assistant and was ultimately responsible for, among other things, creating the fraudulent timesheets at issue in this complaint.

## JURISDICTION AND VENUE

15. The Court has subject matter jurisdiction over the FCA claims alleged in this complaint under 28 U.S.C. §§ 1331 (federal question) and 31 U.S.C. § 3732(a) (False Claims Act).

16. The Court has personal jurisdiction over each Defendant pursuant to 31 U.S.C. § 3732(a) because an act proscribed by 31 U.S.C. § 3729 occurred in this District. 3732(a) further provides for service of process at any place within or outside the United States.

17. Venue is proper in this District pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. § 1391 because an act proscribed by 31 U.S.C. § 3729 occurred within this District; and a substantial part of the events or omissions giving rise to the claims alleged in this complaint occurred in this District.

18. This action was originally commenced in the United States District Court for the District of Columbia. Docket No. 1:21-cv-02184-RJL. That court had personal jurisdiction over each Defendant under 31 U.S.C. § 3732(a) because an act proscribed by 31 U.S.C. § 3729 occurred in the District of Columbia. Venue was proper in the District of Columbia under 31 U.S.C. § 3732(a) and 28 U.S.C. § 1391 because an act proscribed by 31 U.S.C. § 3729 occurred within that district; and a substantial part of the events or omissions giving rise to the claims alleged in this complaint occurred in that district.

19. This action was transferred to this District pursuant to a court order effectuating a stipulation among all parties under 28 U.S.C. § 1404(a) consenting to voluntarily transfer venue to this District.

## FCA SUBJECT MATTER JURISDICTION AND BARS

20. None of the subject matter or other jurisdictional bars set forth in the FCA is applicable to this action, including, but not limited to: the first-to-file bar (31 U.S.C. § 3730(b)(5)); relator culpability bar (31 U.S.C. § 3730 (d)(3)); prior Government action bar (31 U.S.C. § 3730(e)(3)); public disclosure bar (31 U.S.C. § 3730(e)(4)); and statute of limitations (31 U.S.C. § 3731(b)).

21. Prior to any arguable "public disclosure" (as defined by the FCA, 31 U.S.C. § 3730(e)(4)(A)), RELATORS and/or their counsel voluntarily disclosed to the United States Attorney's Office for the District of Columbia (beginning at least as early as August 4,

2021)[3], and/or the United States Attorney's Office for the Central District of California (beginning at least as early as August 28, 2019) [4], the information upon which the allegations or transactions in this complaint are based, within the meaning of the FCA, 31 U.S.C. § 3730(e)(4)(B)(i).

22. Prior to filing this action, Relators voluntarily disclosed to the United States Attorney's Office for the District of Columbia (beginning at least as early as August 4, 2021), and/or the United States Attorney's Office for the Central District of California (beginning at least as early as August 28, 2019), the information on which the allegations or transactions in this complaint are based, within the meaning of the FCA, 31 U.S.C. § 3730(e)(4)(B)(2).

23. Because of the independent knowledge they acquired during their employment at CHROMOLOGIC and compliance with the prefiling disclosure requirements of the FCA, each RELATOR is an "original source" of the information on which these allegations are based, within the meaning of the FCA, 31 U.S.C. § 3730(e)(4)(B)).

## THE FALSE CLAIMS ACT

24. The FCA was originally enacted during the Civil War to combat rampant defense contracting fraud against the Government.

25. It is intended to reach all types of non-IRS fraud, without qualification, that might result in financial loss to the Government.

26. To serve its intended purpose, the FCA includes so-called "*qui tam*" provisions allowing private parties (known as "relators") to initiate and pursue claims where the United States and its tax payers have been defrauded -- even when, as here, the Government declines to intervene in the matter.

//

---

[3] The U.S. Attorney's Office for the District of Columbia declined to intervene in this action.

[4] Relator Johnson filed an action in this Court on January 6, 2020 alleging that Defendants violated the FCA by engaging in the Research Fraud activities alleged in this complaint. Docket No. CV20-00130 (SDF)(SSx). Johnson voluntarily dismissed his prior action in this District without prejudice after the U.S. Attorney's Office for the Central District of California declined to intervene in the matter.

27. Since its enactment, the FCA has become the primary vehicle the Government uses for recouping losses suffered through fraud.

28. Such recoveries have amounted to more than $72 billion since the FCA was amended and strengthened in 1986.

29. The majority of these FCA recoveries have come from *qui tam* lawsuits filed by private persons acting on behalf of the United States.

## FCA LIABILITY, DAMAGES, PENALTIES AND AWARDS

30. Any person who, among other things, (1) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval, or (2) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim, is liable to the United States Government for a civil penalty of not less than $5,500 and not more than $11,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. § 2461 note; Public Law 104–410) (now set as a minimum of $13,946 and a maximum of $27,894, plus three (3) times the amount of damages which the Government sustained because of the act of that person. See 31 U.S.C. §§ 3729(a)(1) ("False Claims Liability") and (2) ("False Statements Liability").

31. Where the Government proceeds with an action initiated by the filing of a *qui tam* complaint and recovers money from a defendant under § 3729, the relator who initiated the action may receive up to twenty-five percent (25%) of the proceeds. Where, as here, the Government does not proceed with such an action and the relator pursues it on his/her own and recovers proceeds from a defendant under § 3729, the relator may receive up to thirty percent (30%) of the proceeds.

32. In either case, the relator is also entitled to an award against the defendant for the amount of all reasonable expenses, attorneys' fees and costs. 31 U.S.C. § 3730(d).

## RELEVANT FCA DEFINITIONS

33. For purposes of the FCA, the terms "knowing" and "knowingly" mean that a person, with respect to information: (i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless

disregard of the truth or falsity of the information, *and no proof of specific intent to defraud is required*. 31 U.S.C. § 3729(b)(1) (emphasis added). See also *United States ex rel. Schutte v. Supervalu Inc*., 598 U.S. 739 (2023) (interpreting the terms "knowing" and "knowingly).

34. For purposes of the FCA, the term "claim" means any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that — is presented to an officer, employee, or agent of the United States; or is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government — provides or has provided any portion of the money or property requested or demanded; or will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded. 31 U.S.C. § 3729(b)(2).

35. For purposes of the FCA, the term "material" means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property. 31 U.S.C. § 3729(b)(4). See also *Universal Health Services, Inc. v. United States ex rel. Escobar*, 579 U.S. 176 (2016) (interpreting the term "material").

## **FCA STATUTE OF LIMITATIONS**

36. Under the FCA, a civil action under section 3730 may not be brought — more than 6 years after the date on which the violation of section 3729 is committed, or more than 3 years after the date when facts material to the right of action are known or reasonably should have been known by the official of the United States charged with responsibility to act in the circumstances, but in no event more than 10 years after the date on which the violation is committed, whichever occurs last. 31 U.S.C. § 3731(b).

## **THE SBA'S SBIR PROGRAM**

### **Program Overview**

37. On July 30, 1953, Congress created the SBA through enactment of the Small Business Act, 15 U.S.C. § 632.

//

38. Congress created the SBA's SBIR Program through the Small Business Innovation Development Act of 1982, 15 U.S.C. § 638(a) ("SBIR Act"). It has been reauthorized a number of times since.

39. Together with the Small Business Technology Transfer ("STTR") Program, and jointly comprising, "America's Seed Fund," the SBIR Program's purpose is to support small research businesses, stimulate private sector innovation and entrepreneurship, and promote free competition in the research and development ("R&D") industry.

40. More specifically, the goal of the SBIR Program is to provide the Government with new and cost effective solutions to complex scientific and technical problems, while also encouraging small businesses to market such technology in the private sector, thereby helping to stimulate the United States economy and labor market.

41. The SBIR Act establishes a system for channeling federal monies to for-profit small businesses engaged in scientific and/or engineering research or research and development. The goal is for these small businesses to take seed money from the Government and develop useful technology that ultimately can be sold by the small businesses in the market place for a significant profit.

42. Under the SBIR Program, federal agencies with extramural R&D budgets over $100 million are required to administer SBIR Programs using an annual set-aside of 3.2% (since FY 2017). 15 U.S.C. § 638(f).

43. Currently, SBIR Program solicitations are awarded by eleven Government funding agencies, namely, the Department of Agriculture, the Department of Commerce, the Department of Defense, the Department of Education, the Department of Energy, the Department of Health and Human Services, the Department of Homeland Security, the Department of Transportation, the Environmental Protection Agency, the National Aeronautics and Space Administration, and the National Science Foundation.

44. The SBIR Act provides that each funding agency is to distribute SBIR funds to small business concerns by unilaterally: (1) determining suitable projects and research topics within its SBIR Program, (2) issuing small business innovation research

solicitations, (3) receiving and evaluating proposals, and (4) awarding grants to qualified participants. 15 U.S.C. § 638(g).

45. The actual payment of grant monies to an awardee/recipient is accomplished via a "funding agreement" between the awarding agency and the small business. 15 U.S.C. §§ 638(e)(3) and (g)(4)-(7). The funding agreement may be in the form of a contract, grant or cooperative agreement entered into between the funding agency and the small business.

46. Among other things, the funding agreement sets out a schedule for the distribution of funding, which is tied to the achievement of certain performance milestones. 15 U.S.C. § 638(g)(7).

47. Approximately $2.5 billion is dispersed annually for research grants awarded under the SBIR Program.

**SBIR Award Phases**

48. The SBIR Program comprises three distinct developmental phases. Phase I is commonly thought of as the "technology feasibility" phase. Phase II is the "demonstration and evaluation of commercial potential" phase. And, Phase III is the "transition to market place" phase.

49. Phases I and II are initiated by the submission of "proposals" (also known as "grant applications") in response to funding agency "solicitations."

50. SBIR solicitations are released quarterly on-line, with the first quarter publication showcasing the funding agencies' R&D interests for the year.

51. One cannot obtain SBIR Phase I funds without first submitting a Phase I proposal. Likewise, one cannot obtain SBIR Phase II funds without first submitting a Phase II proposal. In either case the funding agencies rely on the information in the small businesses' proposals, which representations must be true, accurate and correct and are so certified.

52. Phase I grants and contracts are awarded to recipients based on the technical merit feasibility and commercial potential of their proposed R&D efforts as described in a Phase I grant proposal.

53. Currently, Phase I grants and contracts are awarded in amounts up to $306,872 per grant or contract, although the amount was substantially lower during the time relevant to this complaint.

54. Phase I grants and contracts are awarded for research projects lasting approximately six months to one year.

55. With the exception of certain Direct to Phase II awards not relevant here, Phase II grants and contracts are awarded only to successful Phase I participants.

56. Phase II grant awards and contracts are based on Phase I "data results," which results are expressly reported in detail in Phase II proposal. That is, Phase II grants and contracts are awarded only where the recipient has demonstrated that its new technology is potentially feasible.

57. Phase II grants are awarded not only for the cost of continuing research on scientific and technical issues but are also for determining the potential commercial applications of new technology and products (i.e., "commercialization").

58. Phase II grant awards and contracts are typically for an extended research term of approximately one to two years. In some circumstances they can be extended for one Sequential Phase II Award.

69. Currently, Phase II grants and contracts are awarded in amounts up to $2,045,816 per grant or contract, although the amount was substantially lower during the time relevant to this complaint.

60. Phase III involves private sector or non-SBIR Government agency funding to the small business to patent, market, license, manufacture, or in other ways, commercialize its Phase II project.

**SBIR Grant Evaluation and Award Process**

61. In order to obtain an SBIR grant, applicants respond to agency solicitations with business proposals.

//

//

62. The proposals outline, among other things, the research that will be conducted, the key personnel who will conduct the research and the facilities and equipment that will be used to conduct the research.

63. The proposals also contain a section with a proposed research budget that outlines the proposed expenses, including, among other things, personnel, labor cost, overhead, materials and equipment. All Proposals are submitted with a Standard Form SF424 Application for Federal Assistance ("SF424") or its equivalent. SF424 requires the person filing the submission to certify the following (or its equivalent): "By signing this application, I certify (1) to the statements contained in the list of certifications and (2) that the statements herein are true, complete and accurate to the best of my knowledge. I also provide the required assurances and agree to comply with any resulting terms if I accept an award. I am aware that any false, fictitious, or fraudulent statements or claims may subject me to criminal, civil, or administrative penalties. (U.S. Code, Title 218, Section 1001)."

64. As a threshold matter, to receive an SBIR grant, the applicant must qualify as a "small business concern," defined by the SBA regulations. See 13 CFR §§ 701-705; see also 13 C.F.R. Part 121 (that is, a U.S.-based business, owned by a U.S. citizen or permanent resident alien, with no more than 500 employees, including affiliates).

65. Likewise, the applicant must confirm that the small business will employ the prospective PI, and that the company itself, through its employees, will perform two-thirds (2/3) of the Phase I work and at least one-half (1/2) of the Phase II work. See Defense SBIR/STTR - SBIR / STTR Interactive Participation Guide (defensesbirsttr.mil).

66. SBIR grants and contracts are competitively awarded based on not only scientific and technical merit and feasibility, but also on potential commercialization.

67. Panels of scientists, engineers and agency personnel review and evaluate SBIR grant applications on behalf of the awarding agencies.

68. In evaluating the proposals for SBIR awards, the panel of reviewers rely on the truth and accuracy of the information contained in the proposals (i.e., the Phase I and Phase II grant proposals") as a basis for awarding the grants.

69. Among other things, in recommending the awarding of SBIR grants the evaluators consider the relevant qualifications of the PI and key personnel, including, but not limited to their formal academic credentials and employment history, the soundness and technical merit of the proposed approach, the potential commercial applications of the project, the likelihood that the proposed research will fulfill the requirements of the topic or problem the awarding agency sought to be addressed and the proposed budget. This is based on each funding agency's criteria.

70. Each awarding agency promulgates its own set of SBIR regulations and instructions and distributes its own forms.

71. Most, if not all, of the awarding agencies' rules and documents are available on the agencies' web sites. This is based on each funding agency's criteria for technical merit and soundness.

72. Once a proposal is selected and the Government agency awards an SBIR "contract," the proposal submitted by the applicant, which includes a budget proposal, typically becomes incorporated into the contract and is used as the statement of work.

73. Some awarding agencies, such as the National Science Foundation ("NSF"), refer to the awards as "grants," whereas other agencies, such as NASA and DOD, refer to the awards as "contracts." The terms are used interchangeably in this complaint.

## Timesheets and Costs Reporting

74. The budget summary in the proposals contains an allocation of requested funds to enable the government agency to determine whether the proposed budget is fair and reasonable.

75. The budget summary contains detailed information for each cost element, including, (a) direct labor to the PI and engineers or technical staff, (b) labor rates and hours proposed, (c) direct costs, such as materials, supplies, and lab fees, (d) overhead, (e) general and administrative costs, and (f) fees or profit for the company.

76. The small business is only entitled to research costs actually incurred.

//

77. The SBIR.gov website provides tutorials on accounting practices for grant award recipients.

78. The proposal forms the basis for the amount awarded under the contract, up to the maximum amounts for the Phase I and Phase II grants and contracts.

79. The funding agency relies on the small business to provide accurate costs in the cost budgets in order to set the amount of the grant or contract.

80. In submitting the proposal, the small business is typically required to certify that all information in the proposal is true and accurate.

81. According to SBA's website, "[t]he expectations regarding the sophistication of a small business accounting system changes between Phase 1 and Phase II." That is because a Phase I award involves less money and is usually a firm fixed price award, meaning the recipient is required to perform the work necessary in exchange for the grant amount. SBIR.gov/tutorials/accounting-finance/tutorials2#; see also 48 C.F.R. § 16.202 (discussing firm fixed price contracts).

82. Phase II grant awards on the other hand usually require SBIR grant recipients to move to a cost plus fixed fee ("CPFF") accounting system which allows them to track the cost of each grant and distinguish those costs from one project to another, as well as to distinguish direct and indirect costs. See 48 C.F.R. § 16.306 (discussing cost plus fixed fee contracts).

83. Because the Government will generally only pay award recipients in Phase II based on the documented costs of doing the Phase II work, such documents must accurately reflect those costs, of which labor is the most common cost. SBIR.gov/tutorials/accounting-finance/tutorials2#.

84. In order for SBIR grant recipients in Phase II to accurately reflect their labor costs, each employee of the small business must keep an accurate timesheet, regardless of whether they perform work that is billable to a specific grant project or not. *See* Defense Contract Audit Agency (DCAA) Manual No. 7641.90 *Information for Contractors*, Enclosure 2, Section 4 at p. 16 (requiring companies to keep detailed instructions for

timesheet preparation through a timekeeping manual and/or company procedure indicating that the employee is responsible for "the correct distribution of time by project numbers, contract number or name, or other identifiers for a particular assignment" and for "recording all hours worked whether they are paid or not").

85. Employee timesheets must "list separately each contract, grant and other directly billed projects of the company on which the employee is working," and must be reviewed by a company supervisor. SBIR.gov/tutorials/accounting-finance/tutorials2#; *see also* DCAA Manual No. 7641.90, Enclosure 2, Section 4 at p. 16 (stating that "the supervisor should approve and cosign all timesheets" and that the "guidance should state that the nature of work determines the proper distribution of time, not availability of funding, type of contract, or other factors."); *see also* SF 1408 Preaward Survey of Prospective Contractor Accounting System (including "identification and accumulation of direct costs by contract" as one of the requirements by which DCAA evaluates a company's accounting system).

86. Not only are SBIR participants required to set up an approved accounting system, but they must also certify to having an accounting system in place that meets the requirements of Phase II in order to participate in Phase II funding. This self-certification is done by completing and executing a Standard Form SF 1408 (Preaward Survey of Prospective Contractor (Accounting System) ("SF 1408").

87. The SF 1408 is a document used by the Government to determine a potential contractor's ability to meet a contract's accounting and financial management requirements. Incorrectly completing the SF 1408 can result in an SBIR Phase II proposal being rejected and other potential penalties.

88. Among other things, an SBIR Phase II participant must certify on the SF 1408 that they have "A timekeeping system that identifies employees' labor by intermediate or final cost objectives" and "A labor distribution system that charges direct and indirect labor to the appropriate cost objectives." See SF 1408 Section II – Evaluation Checklist, items e and f.

89. Having a labor cost/employee timekeeping system where management distributes pre-populated timesheets is not an acceptable accounting system. This is particularly true where the persons pre-populating the timecards are involved in tracking SBIR contract budgets.

90. Defense Contract Audit Agency ("DCAA") and Defense Logistics Agency ("DLA") onsite time systems audits play a critical role in ensuring proper SBIR contract billing for labor costs and preventing fraud. They also ensure that the designated PI performs the research called for under the grant or contract and that the SBIR contractor uses its employees to perform two thirds of the Phase I work and one-half of the Phase II work, as required by SBIR time and effort regulations, which regulations are conditions of payment.

**Requests for Payments and Progress Reports**

91. Regardless of the form used to request payments from the various funding agencies, the small business' request is always accompanied by, and payment is always conditioned on, "progress reports" purporting to show that certain research effort milestones have been met. Such reports are appended to as Standard Form 298 (form for submitting scientific and technical reports to contracting officers) ("SF 298").

92. For example, to receive payment for work done on an SBIR project, NASA contracts require the small business to request progress payments from NASA using a Standard Form 1443 ("SF 1443"), also known as a Contractor's Request for Progress Payments, which is accompanied by invoice(s).

93. Similarly, to receive payments on DOD SBIR contracts, the small business must submit a material Inspection and Receiving Report Form 250, also known as a DD250, accompanied by invoice(s).

**BAAS AND THE FEDERAL ACQUISITION REGULATION**

94. A BAA is a tool for acquisitions pursuant to the Federal Acquisition Regulation ("FAR"), codified at Parts 1 through 58 of Title 48 of the Code of Federal Regulations.

//

95. As defined in the FAR, a BAA "means a general announcement of an agency's research interest including criteria for selecting proposals and soliciting the participation of all offerors capable of satisfying the Government's needs." (FAR 2.101.)

96. FAR 6.102(d)(2) further clarifies the use of a BAA for "[c]ompetitive selection of basic and applied research and that part of development not related to the development of a specific system."

97. An agency's use of a BAA in connection with research grants is governed, in part, by the requirements of FAR 35.016 and the other applicable FARs.

98. Individual agencies can also impose requirements with respect to BAAs and contracts awarded pursuant to them.

99. The NIH, for example, has issued a Policy Manual with respect to BAAs setting out procedures in addition to those set out in the FAR ("NIH BAA Manual"). The NIH BAA Manual provides, for example, that "proposals received in response to a BAA shall be evaluated by the peer review process as established at 42 U.S.C. § 289a, 42 CFR Part 52h, NIH Manual Chapters 6315-1 and 7410 and in accordance with the established technical evaluation criteria in the BAA."

**SBIR MILLS**

100. The creation of the SBIR Program, and specifically, its mandate for funding agencies to disperse a fixed percentage of their extramural R&D budgets to small businesses, has spawned the development of a cottage industry sometimes referred to as "SBIR Mills." See, e.g., https://benvanroo.substack.com/p/are-a-few-dozen-sbir-mills-sucking.

101. SBIR Mills tend to operate in a similar fashion. They file a large number of proposals quarterly from which they receive a small percentage of awards. They purport to diligently perform the work required during Phase I and use their putative results to get the more lucrative Phase II awards. Once they have the Phase II award in hand, their diligence drops off dramatically. They do not put a lot of time and effort into the project because there is no contract deliverable to the funding agency and it is easier to simply pocket the

money. This incentivizes SBIR Mills to fabricate and falsify research activities and results in the proposals and progress reports they file with the funding agencies.

102. As for commercialization, SBIR Mills seldom develop useful technology that gets commercialized on any meaningful scale, if at all. Most awards are merely for "dead end" projects. See The Air Force, Impact to the Economy via SBIR-STTR: 2014 Economic Impact Study ("the more SBIR funding they [SBIR Mills] received, the less successful they were at converting that funding into new products and services that achieved commercial sales and/or supported the U.S. defense mission.") See also https://scholar.harvard.edu/files/showell/files/howell_appendix_f_sbir_mills_sept16.pdf. ("mills are less likely to commercialize their projects,… multiple awards are not associated with increased performance for SBIR awardees").

103. Thus, the SBIR Mill's business model is to simply feed from the Government's trough of mandated SBIR grant awards. This leads to the SBIR Mill's dependence on SBIR awards for revenue and the very survival of the enterprise.

104. Another typical tell-tale sign of an SBIR Mill is an unusually high turnover of its scientist employees. This often occurs because the scientists become disenchanted with doing what amounts to unfulfilling fake research on dead end projects.

**GENERAL FACTUAL ALLEGATIONS CONCERNING DEFENDANTS**

105. CHROMOLOGIC holds itself out as a company focused on innovative R&D research that leads to the commercialization of medical and technical breakthrough solutions that save lives and make the world secure.

106. In fact, CHROMOLOGIC operates as an SBIR Mill. With its history of receiving at least 56 SBIR Phase I awards (totaling $9,875,234) and 26 Phase II awards (totaling $26,659,176),, its dependence on a steady stream of SBIR grant revenue (totaling $36,534,410), its fabrication of research results and activities, including time and labor costs, its failure to substantially commercialize its technology, and its high turnover of technical personnel, including scientists and engineers, CHROMOLOGIC perfectly fits the description of an SBIR Mill.

107. As an SBIR Mill, CHROMOLOGIC's proposals responding to funding agency solicitations are its lifeblood, and employees who stand in the way of the submission of proposals and subsequent awards are threatened with termination and even terminated.

108. In sum, to accomplish his fraudulent objectives, MENON created an atmosphere of fear, based on threats and bullying toward CHROMOLOGIC personnel who questioned his tactics or refused to comply with his unethical business practices, many of whom could not push back because of their precarious immigration and employment status.

**Research Fraud**

109. As an SBIR Mill, CHROMOLOGIC engaged in fraudulent practices with respect to the SBIR program and the BAAs by securing Phase I and Phase II SBIR and BAA grants through materially false and misleading statements and omissions in submissions and statements to various federal agencies.

110. MENON orchestrated the fraudulent submissions, directly and through subordinates, including, Rogers, Axtelle and Nguyen, by, among other things, (i) creating or directing others to falsify test data; (ii) copying or directing others to copy from other sources test data and to falsely represent that CHROMOLOGIC had achieved the test results; (iii) falsely representing the commercial viability of products; (iv) falsely representing CHROMOLOGIC's intention to perform research steps; and (v) making false statements to funding agency officials.

111. In furtherance of these fraudulent practices, among other acts, MENON and his agents, including, Rogers and Axtelle directed CHROMOLOGIC scientists (including RELATOR JOHNSON) to misrepresent, falsify and omit data and to make materially false statements and omissions, all to deceive the government agencies from which CHROMOLOGIC was seeking funds.

112. In a similar vein, MENON and his agents Rogers and Axtelle directed CHROMOLOGIC scientists (including RELATOR JOHNSON) to falsify the

commercialization prospects of the programs for which the company was seeking SBIR funding.

**Timesheet Fraud**

113. There were two distinct phases in which CHROMOLOGIC committed Timesheet Fraud. The first ended in or about November/December 2016. The second picked up from there.

114. During the first phase, administrative aide Tiffany Moreno provided employees with hard copies of a Labor Allocation report with "pre-populated" time allocated to certain SBIR projects. Moreno also provided these employees with blank "Timecards" that the employees were to fill out manually by copying the data set out in the Labor Allocation report. The employees then returned the completed and signed Timecards to their managers for approval and use by CHROMOLOGIC.

115. In the second phase, CHROMOLOGIC switched to an electronic timekeeping system using a software called Aestiva, which was installed around November 2016. In this phase, employees would typically receive electronic notices from Susan Dixon, and later Inna Pavlova, to get their Timesheets completed and uploaded. Thereafter, the employees would log onto Aestiva and get to their Timesheets, which were pre-populated with their two-week total hours allocated to specific projects. This was in a field in the lower right-hand corner of the Timesheet captioned "Budget Summary." The employees would then randomly allocate the total budget amounts they were given to specific days in the two-week period and electronically sign and upload the Timesheets for their managers' review and approval.

116. The electronic timesheets used during the second phase of the Timesheet Fraud scheme were distributed to employees on open company software, and each employee was assigned a password by the company to access their timesheets. Former IT manager Mark Medina was the person largely responsible for setting up and managing the timekeeping software and system that CHROMOLOGIC used to assign false times to various SBIR projects.

117. Each timesheet contained a pre-allocated budget summary on the bottom right corner listing the specific SBIR grant projects the employees were supposed to allocate time toward for the past two weeks and stating the total amount of time that employees were supposed to list for that project.

118. The amount of time for all projects listed in the pre-allocated budget summary always totaled 80 hours. Employees were required to record time to specific SBIR grant projects regardless of whether they worked on those projects or not and were required to account for 40 hours of time per week regardless of whether they worked that many hours on a specific SBIR grant project or not, thus resulting in the falsification of employee timesheets.

119. In the fall of 2016, CHROMOLOGIC held a company-wide training in which employees were instructed to spread out the required 80 hours into their time sheets according to the directed time allocations by their supervisors, as opposed to their actual time allocations on various projects. In other words, employees were instructed to fill out time sheets to reflect what their supervisors told them, and not what they actually did.

120. This training was led and/or attended by Axtelle, Nguyen, RELATOR JOHNSON and RELATOR YAE.

121. Sometimes supervisors would explain the need for specific false entries by stating, for example, that a grant award might be near expiration and CHROMOLOGIC wanted to use all of the time allocated to that grant before it expired, regardless of whether the employee actually worked on that grant project or not, or actually worked the number of hours attributed to that grant project or not.

122. Employees were also instructed to not accurately record time they spent on indirect costs, but rather to bill that time to a particular grant project, as if it were a direct cost attributable to a specific grant project.

123. The foregoing was done under the direction of MENON and his agents, including Axtelle and Ngyuen. They collectively caused CHROMOLOGIC supervisors to

//

demand that each of their employees submit a signed completed timesheet by noon on every other Friday. Often the timesheets contained falsely allocated time.

124. MENON and his agents, including Axtelle and Ngyuen, also caused employees to make misrepresentations about their time, or evade questioning about time, during onsite time system audits by DCAA and DLA.

125. For example, it was common knowledge that during such audits there were times when Morena or Dixon would quietly approach employees who were targeted for interviews with government auditors and tell them something like, "Take a walk." In response, the employees would leave the building through a second door or find some way to hide in the lab to evade the auditor's inquiries. JOHNSON observed this happen to a female marketing employee, who responded by asking, "Are you serious?" before following instructions by making herself scarce.

126. MENON and CHROMOLOGIC, through Axtelle and his supervisees, including accountants Susan Dixon and Inna Pavlova, presented those falsified employee timesheets to SBIR funding agencies for payment and were paid. At times, Susan Dixon and/or Inna Pavlova would tell Relator Johnson that payment was made.

## CHROMOLOGIC'S PROCESS OF APPLYING FOR AND RECEIVING SBIR FUNDS

127. During every quarter of every calendar year, with the emphasis on the first quarter, the SBIR funding agencies released solicitations for SBIR contracts. This was done online through the separate funding agencies website portals.

128. Axtelle would scour the agency solicitations, identify Phase I solicitations of potential interest to CHROMOLOGIC and assign them to the prospective PIs he believed should handle the proposal process for each solicitation. There were times when Axtelle assigned projects to employees that they would never support (for example if the project was for the Industrial Solutions Group and the scientist was in the Biomedical Solutions Group). This is particularly significant with respect to the Timesheet Fraud scheme alleged in this complaint.

129. Every scientist at CHROMOLOIGIC was expected by MENON to submit multiple SBIR proposals and win numerous funding agency awards. If the scientists had high SBIR award success rates, they received bonuses that could amount to 10% or more of their compensation. If they had low success rates, they were threatened with termination.

130. After being assigned solicitations, the PIs would then chair "proposal meetings" where the attendees discussed the justification for submitting the Phase I proposal and the preliminary data CHROMOLOGIC would rely on in its proposal to win approval. MENON and Rogers attended and ran every Phase I proposal meeting.

131. Where MENON decided to submit a Phase I proposal it was placed on CHROMOLOGIC's "calendar system" and the assigned PI was ordered to shepherd the proposal through the drafting and submission processes.

132. Frequently, after the Phase I proposal meeting and before the proposal's submission, at MENON's direction, the PIs contacted monitors and/or reviewers at the funding agency by telephone to find out what they were looking for in a successful submission. CHROMOLOGIC's proposals were then tailored accordingly.

133. The PIs prepared a "draft proposal" for the Phase I projects. This was done by following a template MENON had created.

134. The draft Phase I proposals were then sent to another scientist at CHROMOLOGIC for "review and comments."

135. After the internal peer review, the draft Phase I proposals were passed on first to Rogers and then to MENON, both of whom reviewed the proposals at least twice before they were submitted to the funding agencies.

136. MENON invariably made edits and/or suggested changes to every Phase I proposal, including sections concerning how experiments would be conducted and what evidence supported claims for developing a feasible product.

137. If a PI or internal reviewer voiced any doubts or concerns about the viability and feasibility of the proposed Phase I project they faced hostile reactions from MENON and Rogers, including threats of termination.

138. MENON signed off on every Phase I proposal and they were then uploaded by Axtelle to the funding agencies website portals.

139. The funding agencies monitors and peer reviewers would, in turn, evaluate CHROMOLOGIC's Phase I proposals.

140. If their criteria were satisfied, the funding agencies awarded the Phase I projects to CHROMOLOGIC via a funding agreement in the form of either a grant, contract or cooperative agreement. Each funding agency handled contracts and awards in different manners consistent with their policies and procedures.

141. After the Phase I projects were awarded to CHROMOLOGIC, the responsible PIs would chair "kickoff meetings" at which research objectives and tasks were discussed and assigned. MENON presided over every kickoff meeting, which were also attended by Rogers and Axtelle.

142. After the initial Phase I kickoff meeting, the PIs would chair "weekly project meetings" to review progress on the research project. MENON attended most weekly meetings and if not weekly he attended all of them on at least a bi-weekly basis. Rogers and Axtelle also attended all weekly progress meetings.

143. During the life of the Phase I project, the respective PIs would prepare draft periodic progress reports, which were conditions of payment from the funding agencies. The draft progress report would be first submitted to Rogers for his review and edits (all of which were contemporaneously shared with MENON via emails) and then given to MENON to finalize it, typically about two weeks before the progress report was due. For example, CHROMOLOGIC circulated a Bio Phase I work plan for CereTrec that instructed JOHNSON, Katherine Fisher and Wangzhong Sheng  to get quarterly progress reports to Claude Rogers early enough that MENON would have "ample time to review" them.

144. During their reviews of the Phase I progress reports, MENON and Rogers would focus on "data representations and conclusions," in other words, what the research efforts had yielded. If a PI submitted a draft Phase I progress report to MENON or Rogers

with "poor data," meaning research results that reflected negatively on the project's objectives, the scientist would be berated. At times, Rogers or Menon would falsify the data themselves. For the remaining, they directed the writer of the progress reports to falsify and omit data that was considered poor.

145. The Phase I progress reports were appended to forms SF 298 and invoices and uploaded by Axtelle or his assistants (including accountants Susan Dixon and Inna Pavlova) to the funding agencies websites. The SF 298s were typically prepared by CHROMOLOGIC employees and submitted to Government contracting officers on a monthly and quarterly basis and then there was a final submission at the end.

146. It was not uncommon for the funding agencies' representatives (that is, monitors and/or science officers) to have follow up telephone calls with CHROMOLOGIC employees after the submission of Phase I periodic progress reports. However, MENON maintained an iron-clad prohibition against any PI or other scientist participating in such communications without himself, Rogers and/or Axtelle also being on the call. MENON fired at least one employee for violating this gag order. Additionally, MENON identified himself (together with his email address) as the "Business Contact" on all of CHROMOLOGIC's SBIR proposals.

147. If and when PIs or internal reviewers raised questions about the viability of a Phase I during or after the initial kickoff meetings, MENON would insist that no negative information be conveyed to monitors or reviewers at the funding agencies until he deemed it a convenient time, which usually meant when the project's funding was depleted or about to be depleted.

148. CHROMOLOGIC generally followed similar procedures for Phase II projects (that is, kick off meetings, system calendaring, weekly project meetings, periodic progress reports and invoices, follow up telephone calls with funding agency representatives, etc.). MENON was similarly involved in the Phase II activities. For example, on March 5, 2018, MENON sent an email to JOHNSON, Claude Rogers and Wangzhong Sheng concerning

//

the Monthly 29 progress report for Theraspec and told them "see comments. I do not need to review this again unless you have concerns with my comments."

149. There was, however, one significant difference with the Phase II proposals. There, MENON focused with even greater attention on the proposal sections for "data workup," (that is, incorporating the purported results and significance of the Phase I research) and the potential commercialization of the prospective science and technology.

150. In sum, MENON was involved in all aspects of preparing and submitting every SBIR Phase I and Phase II proposal, progress report and invoice, if not personally, then through his trusted top aides Rogers and Axtelle.

151. CHROMOLOGIC followed the foregoing standard operating procedures for the seven specific SBIR grants and contracts discussed in particular detail below.

## SPECIFIC INSTANCES OF RESEARCH FRAUD

152. DEFENDANTS engaged in Research Fraud practices and misconduct concerning numerous SBIR and BAA grants and contracts. The following are seven, non-exhaustive examples of such Research Fraud on SBIR contracts on which CHROMOLGIC applied for, received and retained Government funds.

153. None of these SBIR contracts was ever commercialized.

### A. CereTRec

154. CHROMOLOGIC engaged in Research Fraud in connection with an SBIR Phase I award for a program called CereTRec. Below are the specific details of this fraud. CereTRec was intended to develop a drug that could be used to treat traumatic brain injury ("TBI").

a. Contract Title: Cerebral Trauma Recovery (CereTRec) drug delivery system

b. Contract Number: W81XWH-17-C-0221 (also shown as W81XWH17C0221)

c. Total Award Amount: $149,824

d. Awarding Agency: DOD/DHA (Defense Health Agency)

e. Solicitation Number: 2017.1

f. Solicitation Year: 2017

g. Award Year: 2017

h. Award Start Date: September 25, 2017

i. Award End Date: April 24, 2018

j. PI: RELATOR JOHNSON

k. Business Contact: DEFENDANT MENON

l. Abstract In order to meet the Defense Health Agency's need for addressing the prevention of secondary brain injury from moderate, severe and penetrating traumatic brain injury (TBI), CHROMOLOGIC proposes to develop a cerebral trauma recovery (CereTRec) drug delivery system. In particular, CereTRec aims to treat TBI during prolonged field care (PFC) to stabilize casualties who sustain a moderate-severe TBI. In Phase I, CHROMOLOGIC will develop, formulate, and test CereTRec for in vitro pre-clinical studies. In Phase II, CereTRec will be refined to be tested in large animal or non-human primate pre-clinical models of moderate-severe TBI for efficacy and drug dose.

m. Specific fraudulent misrepresentation(s)/misconduct: During the course of the Phase I SBIR, MENON was less interested in the data, but more interested in how he could maximize his profit from the program. MENON directed JOHNSON to compromise experiments and data for the sake of financial gain, even ordering JOHNSON to produce a fabricated/exaggerated "dose-response curve" (i.e., track concentration and release over time) on neuronal primary cells that had never been made for the Phase I progress reports. JOHNSON produced this data and subsequently CHROMOLOGIC used it for the Phase II proposal. Menon ordered Johnson to fabricate data to show that CereTRec was safe at the reported dose, despite the drug not having been tested properly.

155. CHROMOLOGIC engaged in Research Fraud in connection with an SBIR Phase II award for CereTRec. Below are the specific details of this fraud.

//

a. Contract Title: Point of Injury Therapy to Maintain and Stabilize Moderate-Severe Traumatic Brain Injury (TBI) Casualties.

b. Contract Number: W81XWH-18-C-0358 (also shown as W81XWH18C0358)

c. Total Award Amount: $999,986

d. Awarding Agency: DOD/DHA

e. Solicitation Number: 2017.1

f. Solicitation Year: 2017

g. Award Year: 2018

h. Award Start Date: August 27, 2018

i. Award End Date: January 26, 2021

j. PI: RELATOR JOHNSON. Other employees on project: Claude Rogers, Wangzhong Sheng and DEFENDANT MENON

k. Business Contact: DEFENDANT MENON

l. Abstract: In order to meet the Defense Health Agency's need for addressing the prevention of secondary brain injury from moderate, severe and penetrating traumatic brain injury (TBI), CHROMOLOGIC proposes to develop a cerebral trauma recovery (CereTRec) drug delivery system. In particular, CereTRec aims to treat TBI during prolonged field care (PFC) to stabilize casualties who sustain a moderate-severe TBI. In Phase II, CereTRec will be refined to be tested in large animal or non-human primate pre-clinical models of moderate-severe TBI for efficacy and drug dose.

m. Specific fraudulent misrepresentation(s)/misconduct: In the Phase II solicitation, CHROMOLOGIC falsely represented its intention to complete various animal (mice) studies to determine the best formulation for efficacy and safety studies. In fact MENON had no intention of completing the studies as CHROMOLOGIC represented it would and CHROMOLOGIC never completed such studies because MENON did not want to spend money to conduct .animal studies and decided to forgo them. When JOHNSON tried to have the animal studies done, MENON threatened to kick him off the program. Accordingly, all representations in the Phase II solicitation and subsequent progress

reports that referred or related to animal studies were false and entirely fabricated. For example, CHROMOLOGIC, through Claude Rogers as PI submitted a progress report with fabricated data for a study that was never actually conducted.

### B. miDOS/MiRAD

156. miDOS involved the creation of a micro RNA-based tissue-specific radiation biodosimiter. Its function was to "measure the concentration of circulating microRNA (miRNA) . . . and provide tissue specific radiation biodosimitry." That is, miDOS was intended to develop a prototype of a medical device that could identify lethal or problematic levels of radiation in people who were exposed through nuclear accidents or attacks by testing certain biomarkers (here micro RNAs that are altered due to exposure to radiation) in their bodies.

157. MiRAD's objective was essentially the same as miDOS', namely, to "measure changes in microRNA biomarkers in a patient's blood for diagnosis of" acute radiation syndrome. While miDOS was to report as to the existence of biomarkers, MiRAD was to measure the concentrations of the biomarkers. In other words, miDOS and MiRAD were both projects to address the tracking of miRNAs in a person to determine partial radiation dose.

158. Both proposals submitted by Chromologic claim to develop an instrument that would be point-of-care ("POC") in nature and act to identify those exposed to radiation following a radiation/nuclear event. In short, the only difference between the two projects was their names.

159. HHS/NIH awarded CHROMOLOGIC a BAA award Phase I award for miDOS in the amount of $1,751,981. The award date was February 28, 2017, and the contract number was HHSN272201700012C.

160. RELATOR JOHNSON was a support scientist on miDOS.

//

//

161. Other employees on miDOS were: Agnes Lukaszewicz, Claude Rogers, Katherine Fisher, Michelle Nguyen, Mark Starbird, RELATOR JOHNSON and DEFENDANT MENON.

162. The miDOS Phase II contract number was 2R44AI108019-04.

163. The MiRAD Phase I contract data is as follows.

a. Contract Title: MicroRNA-Based Radiation Biodosimeter (MiRAD)

b. Contract Number: 1R43AI108019-01A1 and Project Number: 1R43AI108019-01A1

c. Total Award Amount: $ 585,555

d. Awarding Agency: HHS/NIH (National Institute of Allergy and Infectious Diseases or "NIAID".)

e. Solicitation Number: PA12-044

f. Solicitation Year: 2014

g. Award Year: 2014

h. Award Start Date: June 1, 2014

i. Award End Date: May 31, 2017

j. PI: Claude J. Rogers

k. Business Contact: DEFENDANT MENON

l. Abstract: The broad long term goal of this project is to develop an optically based radiation biodosimeter that rapidly measures changes in serological microRNA miRNA biomarkers to predict acute radiation syndrome (ARS). MicroRNAs (miRNAs) are short base noncoding RNA strands that control a host of biological processes through regulation of protein expression. Exposure to radiation has been shown to alter expression of a miRNA panel linked with ARS, thereby establishing that serum concentration of these miRNAs could be used as a predictive assay for ARS. To measure changes in these miRNA radiation biomarkers we will develop a MicroRNA based Radiation Biodosimeter MiRAD system which combines automated magnetic bead based screening for miRNA targets with Amplified Reflectometric Interference Analysis (ARIA), a patented

CHROMOLOGIC technology for highly sensitive and specific quantification of s of miRNA radiation biomarkers in parallel. In preliminary studies we have demonstrated the novel concept of the device and its ability to accurately measure subfemtomolar concentrations of miRNA in ovarian cancer serum samples (many times less than current RNA quantification platforms such as RT PCR). Our preliminary studies using rodent plasma also have identified panel of miRNAs with dose and time dependent response to whole body irradiation (WBI) in a dose range relevant to medical triage in case of a radiological event The hypotheses we seek to validate under the proposed proof of concept study are the miRNA panel identified in a murine model through analysis of plasma can be used to measure WBI dose in a clinical setting, A similar miRNA panel can be used to measure WBI dose in nonhuman primates and humans the resulting identification of a unique and dose responsive combination of miRNA markers will result in a rapid POC blood based microchip assay for anticipating ARS within the first week of exposure thereby guiding the allocation of exposed subjects for timely medical intervention. PUBLIC HEALTH RELEVANCE A critical need exists in the area of radiation countermeasures to properly diagnose and treat victims of a nuclear or radiological incident who are at risk for developing acute radiation syndrome (ARS) CHROMOLOGIC proposes to develop the MiRAD technology which will measure changes in microRNA biomarkers in a patient's blood for diagnosis of ARS The creation of this predictive diagnostic system will result in early and improved treatment allocation, reduced mortality, and provide a means of predicting toxicities in patients undergoing radiotherapy especially in situations where over or under dosing remain a concern

164. The MiRAD Phase II contract data is as follows:

a. Contract Title: MicroRNA-based Radiation Biodosimeter (MiRAD) Phase II

b. Contract Number: 2R44AI108019-03 and Project Number: 5R44AI108019-04

c. Total Award Amount: $2,999,779

d. Awarding Agency: HHS/NIH (National Institute of Allergy and Infectious Diseases.)

e. Solicitation Number: PA15-065 (also shown as PA-15-065)

f. Solicitation Year: 2015

g. Award Year: 2018

h. Award Start Date: September 5, 2018

i. Award End Date: August 31, 2021

j. PI: Claude J. Rogers. Grant Application Reviewer: RELATOR JOHNSON

k. Business Contact: DEFENDANT MENON

l. Abstract: Abstract In response to PA-15-065, the broad long-term goal of this project is to develop a portable radiation biodosimeter to be used at the point-of-care (POC) for assessing precise radiation exposure and susceptibility for acute radiation syndrome (ARS) within the first 7 days of exposure starting with ~250 µL of blood collected from a finger stick and a turnaround time (TAT) of less than 40 minutes. The device measures changes in circulating microRNA (miRNA), small RNA molecules 18–24 nucleotides long that are released into the circulatory system by cells throughout the body, as biomarkers. These molecules can provide a means to assess the systemic health of the individual via a minimally invasive blood draw of a small amount of blood. Exposure to radiation has been shown to alter expression specific miRNA sequences, thereby establishing that these biomarkers could be used as a predictive assay for ARS. To measure changes in these miRNA radiation biomarkers, we will develop a microRNA-based Radiation Biodosimeter (MiRAD) system, which combines (1) POC isolation of circulating miRNA from whole blood, (2) detection of miRNA abundance using a battery-operated, portable RT- qPCR system adapted for use at the POC, and (3) specialized data processing algorithms to estimate exposed dose based on the miRNA profile of a panel of key markers. In Phase I, we have demonstrated in non-human primate (NHP) and pilot clinical studies that circulating concentrations of specific miRNA biomarkers are sensitive to exposure to whole body ionizing radiation in a dose- and time-dependent manner. A small amount of whole blood (200–500 µL), taken in the field, is processed using a novel sample preparation kit we developed and commercialized (www.chromologic.com/mir-clear), that performs (a) chemo-mechanical isolation of plasma, and (b) extraction of circulating microRNA (miRNA) without the need for power, laboratory equipment, or a technical user. Specific miRNA radiation

biomarkers are analyzed by the MiRAD PCR assay using commercial, off-the- shelf, battery-operated PCR machines. Based on the profile of the miRNA biomarker panel, MiRAD estimates the amount of absorbed radiation by the patient. During Phase I, we developed a robust analytical method and identified a panel of miRNA biomarkers capable of accurate estimation of exposed dose and asymptomatically predict the onset of hematopoiesis and ARS using mice, non-human primate (NHP), and clinical samples. Moreover, we found that key miRNA radiation biomarkers were present in sufficient abundance, and changed in response to radiation dose (0–6.5 Gy) with sufficient magnitude (up to 25-fold), to allow isolation from about 200 μL of plasma with our proprietary POC sample processing kit and quantification by COTS qPCR. A critical need exists in the area of radiation countermeasures to properly diagnose and treat victims of a nuclear or radiological incident who are at risk for developing acute radiation syndrome (ARS). CHROMOLOGIC proposes to develop the MiRAD technology, which will measure changes in microRNA biomarkers in a patient's blood for diagnosis of ARS. The creation of this predictive diagnostic system will result in earlier and improved treatment allocation, reduced mortality, and provide a means of predicting toxicities in patients undergoing radiotherapy, especially in situations where over- or under-dosing remain a concern.

m. Specific fraudulent misrepresentation(s)/misconduct: CHROMOLOGIC, through Claude Rogers, plagiarized data from miDOS research in the MiRAD Phase II proposal. Furthermore, miDOS data was not disclosed as being used to support MiRAD Phase II proposal.

165. DEFENDANT MENON repeatedly stated in project meetings miDOS and MiRAD would be CHROMOLOGIC's "gravy train" and he would "milk it for years."

166. MENON also forced the bioinformatics scientist Katherine Fisher to falsify and misrepresent data on Phase II progress reports and in a face to face and multiple telephone conferences with Government representatives/project managers (including Marylan lnu) under threat of termination. Specifically, MENON forced Fisher to state in sum and in substance that no further testing was needed in Phase II because sufficient proof had been obtained, when, in fact, there were still key unknowns, such as there was not a

defined understanding of what the spike in data was telling us about identifying miRNAs. This was key to understanding how to determine radiation-specific indicators/biomarkers for the program. Additionally, Claude Rogers manipulated (or "filtered" in his words) Fisher's data to falsely show that conclusive/favorable results had been achieved, when they had no conclusive results and the sampling was insufficient.

167. CHROMOLOGIC never developed a device prototype for either the miDOS or MiRAD projects.

### C. MagTaT

168. CHROMOLOGIC engaged in fraud in connection with an SBIR grant for a program called MagTaT, short for Magnetically Targeted Therapeutics system.

169. MagTaT involved the development of drug that was intended to be "an orally administered nanoparticle formulation" for management of pain from Peripheral Neuropathy.

170. The MagTaT Phase I contract data is as follows.

a. Contract Title: Magnetically Targeted Therapeutics System

b. Contract Number: W81XWH16C0181

c. Total Award Amount: $ $99,971.86

d. Awarding Agency: DOD/Army (Medical Research

e. Proposal Number: A161-059-0952

f. Proposal Year: 2016

g. Award Year: 2016

h. Award Start Date: September 28, 2016

i. Award End Date: March 2017

j. PI: Louis Chin Jones. Support Scientist: RELATOR JOHNSON

k. Business Contact: DEFENDANT MENON

l. Abstract: MagTat was a polymer-based nanoparticle system aimed at magnetically accumulating at the site of pain and releasing therapeutics to treat peripheral neuropathy.

m. Specific fraudulent misrepresentation(s)/misconduct: DEFENDANT MENON directed RELATOR JOHNSON to falsify data on toxicity. In lieu of needed additional research and testing, MENON said CHROMOLOGIC would simply utilize existing data, which Claude Rogers altered at MENON's direction – to make seem as if we redone the experiments based on the feedback from the government monitor. Such falsified data was included in the Phase II proposal and also various Phase I progress reports that CHROMOLOGIC submitted to DOD. The latter included falsified data in Figure 2-3 and the corresponding discussion in Report No. 4 for Phase I and Figure 2-3 and the corresponding discussion in Report No. 5.

171. CHROMOLOGIC applied for a Phase II MagTaT but it was denied.

172. Additional allegations concerning MagTaT fraud: RELATOR JOHNSON set up drug release studies that demonstrated the process was not consistent in the release kinetics. DEFENDANT MENON ordered Claude Rogers to step in and address how to falsely represent the data to the Government. Louis Chin Jones joined a meeting with the DOD monitor David Duke and science officer, in which Jones admitted to the false data in the Phase I program. The monitor raised concerns and brought these allegations to MENON. In response to Jones' whistleblowing on his own program, MENON promptly fired him. MENON then implemented his policy requiring that CHROMOLOGIC employees could only communicate with Government representatives if he , Jim Axtelle or Claude Rogers was present. Likewise, MENON instituted a rule that all employee's emails to Government representatives had to be reviewed by him, Axtelle or Rogers before they were sent.

## D. OPPAH

173. CHROMOLOGIC engaged in fraud in connection with an SBIR grant for a program called Ocular Penetrating/Perforating injuries Assessment Hydrogel system ("OPPAH").

174. OPPAH involved the development of a test administered by a medic at Role of Care Level One to detect the presence of penetrating ocular injury. In other words, the project was intended to develop a proto type for a medical device to test for eye injuries.

175. The Phase I contract information for OPPAH is as follows:

a. Contract Title: Ocular Penetrating/Perforating injuries Assessment Hydrogel system (OPPAH)

b. Contract Number: W81XWH19C0001

c. Total Award Amount: $ 149,957

d. Awarding Agency: DOD/DHA

e. Solicitation Number: 18.2

f. Solicitation Year: 2018

g. Award Year: 2019

h. Award Start Date: December 17, 2018

i. Award End Date: July 16, 2019

j. PI: Lormen Lue. Support Scientist/Grant Reviewer/Successor PI: RELATOR JOHNSON

k. Business Contact: DEFENDANT MENON

l. Abstract: In order to meet Defense Health Agency's need for rapid confirmation and evaluation of open globe injuries, to allow for appropriate initial triage, evacuation, and treatments, CHROMOLOGIC LLC (CL) proposes to develop an Ocular Penetrating/Perforating injury detection.

m. Specific fraudulent misrepresentation(s)/misconduct: CHROMOLOGIC submitted Phase I progress reports which included fabricated data on concentration levels of aqueous humor that would indicate a penetrating/perforating injury, when, in fact, such concentrations could not be detected. These false concentration level results were repeated in a Phase II application for OPPAH that was denied. MENON directed Claude Rogers and JOHNSON to falsify this data.

176. When JOHNSON protested that certain Phase I tests would not work, specifically, that aqueous humor could not be detected, MENON replaced JOHNSON, who had become successor PI, with Espoir Kyubwa.

## E. SYNFACT

177. CHROMOLOGIC engaged in fraud with respect to an SBIR grant for a program called SYNFACT.

178. SYNFACT involved the development of synthetically formulated anatomically correct skin and organ tissues. Its objective was to develop synthetic tissues for mimicking the healing process that could be used to train medical personnel in how to suture it.

179. The contract data for Phase I for SYNFACT is as follows:

a. Contract Title: Synthetically Formulated Anatomically Correct Tissues (SYNFACT)

b. Contract Number: W81XWH-17-C-0197 (also shown as (W81XWH17C-0197)

c. Total Award Amount: $149,950

d. Awarding Agency: DOD/DHA

e. Solicitation Number: 2017.1

f. Solicitation Year: 2017

g. Award Year: 2017

h. Award Start Date: September 15, 2017

i. Award End Date: April 14, 2018

j. PI: RELATOR JOHNSON

k. Business Contact: DEFENDANT MENON

l. Abstract: In order to meet Defense Health Agency's need for anatomically correct, self-healing, synthetic tissues for surgical training, CHROMOLOGIC proposes to develop synthetically formulated anatomically correct tissues (SYNFACT). Surgical training

models will be selected for fabrication on the SYNFACT system GUI and fabricated on site. SYNFACT surgical training models will self-heal between uses for reuse within 24 hours. In Phase I, CHROMOLOGIC will develop, fabricate and test a suite of SYNFACT grafts and will develop a prototype fabrication tool. In Phase II, SYNFACT graft materials will be refined and multiple-tissue models and fabrication processes, and a second generation fabrication tool with a simple GUI designed, prototyped and tested.

m. Specific fraudulent misrepresentation(s)/misconduct: In the Phase I, CHROMOLOGIC falsely represented its intention to carry out the studies/experiments that would meet the specifications of contract performance and goals and submitted false progress reports with fabricated results. Specifically, CHROMOLOGIC submitted to the Government a video purporting to show self-healing tissues (hydrogel) when in fact the separated hydrogel was Superglued together. They made up results to satisfy the requirements of the Phase I.

180. The Phase II contract data for SYFACT is as follows:

a. Contract Title: Self-Healing Elastomer for Medical Simulation & Training

b. Contract Number: W81XWH-18-C-0094 (also shown as W81XWH18C0094)

c. Total Award Amount: $ 999,912

d. Awarding Agency: DOD/DHA

e. Solicitation Number: 2017.1

f. Solicitation Year: 2017

g. Award Year: 2018

h. Award Start Date: September 24, 2018

i. Award End Date: February 23, 2021

j. PI: RELATOR JOHNSON

k. Business Contact: DEFENDANT MENON

l. Abstract: In order to meet Defense Health Agency's need for anatomically correct, self-healing, synthetic tissues for surgical training, CHROMOLOGIC proposes to develop synthetically formulated anatomically correct tissues (SYNFACT).

m. Specific fraudulent misrepresentation(s)/misconduct: Phase I false results were incorporated into the Phase II Proposal. Additionally, CHROMOLOGIC made false statements in progress reports for the Phase II work. For example, CHROMOLOGIC misrepresented in Section 4.0 of its Phase II Report No. 5 its intention to complete the work set out therein; CHROMOLOGIC had no intention of completing that work and, in fact, never completed it.

181. Additional fraud allegations: During the Phase I program, DEFENDANT MENON was upset about having to spend money to carry out experiments and produce material. He therefore directed RELATOR JONHSON and others to generate a "tissue" that ultimately did not simulate the healing process in the end. MENON knew of this failure but pressured JOHNSON and others to generate photos and video of the false self-healing tissue for the progress reports. During Phase I, JOHNSON tried to alert Hugh Connacher, the DOD monitor, during a telephone call about the project's deficiencies. But MENON precluded this by telling JOHNSON "shut up" during the call. When CHROMOLOGIC was supposed to produce a tissue sample for DOD at the end of the Phase I program, JOHNSON and others were forced by MENON to purposely package the tissue to disintegrate in transport to the Government so the monitor would not know the truth about CHROMOLOGIC's lack of progress. During Phase II, JOHNSON tried to get MENON to send proper tissue samples to the DOD but MENON refused, saying, "do not bother sending them anything unless they ask for it." MENON also made JOHNSON and others generate falsified reports on the progress of the Phase II program. Everything was false about Phase II. No self-healing tissue was created and no experiments were done to even attempt to actually do so. It got so bad, JOHNSON quit his job and took another job as a contractor at a pharmaceutical company (Celgene) three hours away from his home.

//

## F. THERASPEC

182. CHROMOLOGIC engaged in fraud with respect to an SBIR grant for a program called THERASPEC.

183. THERASPEC involved a spectroscopic system for therapeutic drug monitoring. The intended product was "a point- of-care ("POC)" in vitro diagnostic device that quantifies antibiotics and antifungals circulating in blood plasma using Raman Spectroscopy." In other words, the objective was to develop a proto type for a blood testing medical device.

184. The contract data for the THERASPEC Phase I award is as follows:

a. Contract Title: Spectroscopic system for therapeutic drug monitoring

b. Contract Number: W81XWH-15-C-0127

c. Total Award Amount: $999,988.00

d. Awarding Agency: Department of Defense

e. Solicitation Number: A13-082 2013.2

f. Solicitation Year: 2013

g. Award Year: 2015

h. Award Start Date: 9/25/2015

i. Award End Date: 2/27/2018

j. PI:

k. Business Contact: DEFENDANT MENON

l. Abstract:

m. Specific fraudulent misrepresentation(s)/misconduct: All the data presented in Phase I was false and could not be replicated in Phase II.

185. The contract data for Phase II of THERASPEC is as follows:

a. Contract Title: Spectroscopic System for Therapeutic Drug Monitoring (THERASPEC)

b. Contract Number: W81XWH-15-C-0127

c. Total Award Amount: $ 999,988

d. Awarding Agency: DOD/DHA

e. Solicitation Number: 2013.2

f. Solicitation Year: 2013

g. Award Year: 2015

h. Award Start Date: September 25, 2015

i. Award End Date: February 27, 2018

j. PI: Anu Biswas

k. Business Contact: DEFENDANT MENON

l. Abstract: CHROMOLOGIC LLC (CL) is developing a Spectroscopic System for Therapeutic Drug Monitoring (THERASPEC), to meet the Army's need for a compact, robust system to assess the peak and trough therapeutic drug concentrations in blood to provide real-time TDM in fixed and field medical facilities. The THERASPEC prototype is based on a spectroscopic system for therapeutic drug monitoring.

m. Specific fraudulent misrepresentation(s)/misconduct: The Phase I reports concluded that the THERASPEC device was able to detect therapeutically relevant concentrations of vancomycin and other very important antifungals and antimicrobials. This representation was false. The data supporting it was plagiarized from other tests that did not use the THERASPEC device. In addition, in the Phase II reports, CHROMOLOGIC submitted falsified data relating to therapeutic drug concentrations. The drug of interest was spiked into the sample after the sample was filtered and then measured. In some cases, the drug of interest was spiked into buffer and tested but reported as being tested in samples derived from whole blood samples. CHROMOLOGIC employees, at MENON's direction, performed tests on whole blood samples after they had passed the blood through a sieve and eliminated the vast majority of proteins, which then allowed Chromologic to falsely claim that therapeutically relevant concentrations of vancomycin were detectable.

186. Additional fraud allegations: RELATOR JOHNSON and others told MENON they did not want to present falsified data in the THERASPEC Phase II solicitation. MENON overrode these objections and ordered the submission of the falsified data. CHROMOLOGIC employees were never able to replicate the data reported in the Phase I program. During the Phase II solicitation, MENON and Rogers told JOHNSON and others, including Louis Chin Jones and Wangzhong Sheng, during weekly THERASPEC project meetings to continue restating the false Phase I data in Phase II progress reports. JOHNSON and others followed this directive.

187. The key to the THERASPEC fraud was in defining when the antifungal/microbial was spiked into the whole blood/plasma. Spike ins would be identical to "real world" conditions if the drug was spiked into the whole blood. However, the spike ins were never spiked into the whole blood. Rather, the spike ins were introduced into the filtered and "processed" plasma sample – some three steps in processing from the claimed point at which the drug was usually spiked into the sample.

188. For all THERASPEC Phase II reports, MENON and Rogers were aware of the "spike in" fraud on this program and chose to continue it.

189. CHROMOLOGIC's Phase II progress reports also falsely claimed that THERASPEC was contained in a small ruggedized bedside module (approximately one foot by one foot in size). In fact, it was the contained in a 10 foot by 10 foot lab space.

190. CHROMOLOGIC employees Louis Chin Jones and Wangzhong Sheng (to name only a few) tried to redress the false representations in the THERASPEC Phase II progress reports. When they did MENON and Rogers threatened to terminate their jobs.

191. CHROMOLOGIC never developed a prototype medical device for THERASPEC.

## G. BAID

192. CHROMOLOGIC engaged in fraud with respect to an SBIR grant for a program called BAID.

//

193. BAID involved the development of a biometric identification and access management system. The intended users were medical personnel and patients in situations with intermittent network access.

194. More specifically, the objective of the BAID Phase I program was to develop an interface for soldiers to diagnose themselves through a digital process – on either a computer or phone – so that no physical interaction between the soldier and medical personnel would be required.

195. The Phase I contract data for BAID is a follows:

a. Contract Title: Biometric Authentication and Identification (BAID)

b. Contract Number: W81XWH-18-C-0011

c. Total Award Amount: $149,917

d. Awarding Agency: DOD/Army

e. Solicitation Number: 17.1

f. Solicitation Year: 2017

g. Award Year: 2017

h. Award Start Date: June 22, 2017

i. Award End Date: May 6, 2019

j. PI: Virginio Sannibale. Grant Reviewer: RELATOR JOHNSON

k. Business Contact: DEFENDANT MENON

l. Abstract: In order to meet the US Army's need for a biometric access management system for medical personnel on Android-based platforms, CHROMOLOGIC (CL) proposes to develop a Biometric Authentication and Identification ("BAID") system. The BAID Android app will be installed on the Army's Nett Warrior devices for medics to use as an access management tool which functions without requiring network access for use with apps including the eTCCC app. Additionally, the system enables patient identification, providing Nett Warrior device apps with a biometric ID to link eTCCC electronic cards and patient information throughout the continuum of care. BAID's

compact hardware for collecting biometrics will be stored conveniently with the Nett Warrior platform. In Phase I, CL will develop the system design, show and test a proof of concept of system hardware and software architecture for the access management and patient identification capabilities of the BAID system. The Phase II development effort will develop a ruggedized prototype and a 2nd generation software app with access management capability for use with the eTCCC app and other android applications.

m. Specific fraudulent misrepresentation(s)/misconduct: RELATOR JOHNSON learned that much of the information in the Phase I reports was falsified. Specifically, RELATOR JOHNSON learned that the Phase I option reports included falsified results and outcomes information. CHROMOLOGIC employee Ed Burns told JOHNSON that he had to make up data for the project because the persons involved in this grant kept losing sight of when progress reports were due and thus he had to make up results and outcomes when, in fact, no work had been done on the project. Burns admitted that the data in the Phase I proposal was completely false and he knew that because he had written it.

196. The Phase II contract data for BAID is as follows:

a. Contract Title: Biometric Authentication and Identification (BAID)

b. Contract Number: W81XWH-19-C-0066

c. Total Award Amount: $999,958

d. Awarding Agency: DOD/Army

e. Solicitation Number: 17.1

f. Solicitation Year: 2017

g. Award Year: 2019

h. Award Start Date: November 15, 2018

i. Award End Date: May 6, 2021

j. PI: Claude Rogers

k. Business Contact: DEFENDANT MENON

l. Abstract: In order to meet the US Army's need for a biometric identification and access management system for medical personnel and patients for Android-based platforms for operation in situations with intermittent network access, CHROMOLOGIC proposes to develop a Biometric Authentication and Identification (BAID) system. BAID consists of an Android OS application and biometric collection hardware leveraging existing biometric identification techniques to gate access to existing Army EHR databases. The BAID system will allow healthcare professionals to use a simple biometric scan to gain HIPAA-compliant access to medical records and to uniquely identify unknown patients using biometric data. In Phase I, CHROMOLOGIC developed a functional prototype of the BAID system. In Phase II, CL will refine and optimize the BAID system, including miniaturizing and ruggedizing the biometric scanning hardware, for military use.

m. Specific fraudulent misrepresentation(s)/misconduct: All the data from the EEG was falsified and this was managed by Rogers and directed by Menon.

197. Additional fraud allegations, once when Sannibale told DEFENDANT MENON that the BAID device did not work as expected, MENON became angry and threw a stack of Jenga pieces at a wall. After that, MENON ordered employee Ed Burns to "ghost write" Sannibale's solicitations because Sannibale objected to using false EEG data.

## **SPECIFIC INSTANCES OF TIMESHEET FRAUD**

### **Johnson**

198. At various times relevant to this complaint, RELATOR JOHNSON was instructed by Rogers, Axtelle, Nguyen and others at CHROMOLOGIC to falsify timesheets to indicate that he had performed work on various SBIR grant projects when he had not.

199. For example, on 3/6/2018, Susan Dixon sent JOHNSON an email advising him she was artificially allocating his time among contracts by noting, "Sorry to alarm you. I removed all Synfact & Ceretec hours from your budget because we already spent the

//

//

allotted hours. I am so busy that I didn't have time to fix it yet. I am hoping to fix it soon, definitely before Friday, when the next time card is due."

200. Likewise, JOHNSON and other employees received an email from Moreno dated 10/20/2016 telling them that they should "Use attached updated labor allocation. Please turn in our time care by tomorrow at noon and date it 10/21/2016." The "updated labor allocation" refers to the pre-populated data that employees were being directed to use. The fact that the data was "updated" indicates that the numbers were being falsified to meet CHROMOLOGIC budgetary needs and not to accurately reflect time spent on SBIR projects.

201. This included false time entries on labor cost records for the following six grant projects— Biovoto, Unitrac, Ocosmo, OFAM, Flocop and miDOS.

202. Notably, JOHNSON was neither responsible for, nor performed any work on, the Biovoto, Unitrac, Ocosmo, OFAM and Flocop projects whatsoever.

203. For example, JOHNSON received a pre-populated Labor Allocation report for the period 10'/10/16 that falsely listed 10 hours for Bio-Boto and 50 hours for FLOCOP when in fact he had spent zero hours on these projects, and, as a result JOHNSON was forced to replicate this false data on his Time Card for that period.

204. For a second example, JOHNSON similarly received and was forced to replicate false time data on a TimeSheet (No. 1098) for the period beginning 1/30/2017, which showed 10 hours for Medsem II, 10 hours for Ocosmo, 10 hours for Orient and 10 hours for Ofam II, when, in fact, JOHNSON spent zero hours on these projects.

205. CHROMOLOGIC, through Axtelle, Dixon and Pavlova submitted JOHNSON's false timesheets to the respective funding agencies.

**Yae**

206. Similarly, at various times relevant to this complaint, RELATOR YAE was instructed by Axtelle, Ngyen and others at CHROMOLOGIC to falsify timesheets to indicate he had performed work on various SBIR grant projects when he had not.

//

207. This included false time entries on labor cost records for the following four grant projects — Ofam II, Quantek, G&A, and UCLA.

208. Notably, YAE was neither responsible for, nor performed any work on, the Ofam II and UCLA projects whatsoever.

209. For example, YAE was forced to fill out a timecard based on a pre-populated timesheet for the week of 07/30/2018 stating he had spent 8 hours working on Ofam II (4 hours for 08/02 and 4 hours for 08/03), when, in fact, YAE had not worked on this project at all.

210. CHROMOLOGIC, through Axtelle, Dixon and Pavlova submitted YAE's false timesheets to the respective funding agencies.

**Other Chromologic Employees**

211. CHROMOLOGIC billed the respective funding agencies for the time of current or former Biomedical Solutions Group scientists for Industrial Solutions Group projects that these employees did not support and on which they never worked, including the following people:

a. Wangzhong Sheng.
b. Katherine Fisher.
c. Agnes Lukaszewicz.
d. Edward Burns.
e. Lormen Lue.
f. Louis Chin Jones.
g. Ross Steinberg.
h. Esmaeil Heidari.

**RESEARCH FRAUD MATERIAITY**

212. The Government has repeatedly notified the public that misrepresenting the research done and results achieved under SBIR contracts and awards is a form of fraud that subjects the perpetrator to administrative, civil and criminal sanctions. See, e.g., https://www.volpe.dot.gov/sites/volpe.dot.gov/files/2021-11/DOT-SBIR-Volpe-

Center-Fraud-Briefing_2021.pdf (SBIR fraud includes misrepresenting work done and results achieved – plagiarized reports or falsely claiming work has been completed).; https://www.cdc.gov/os/technology/innovation/sbir/fwa.htm (SBIR fraud includes "reports falsely claiming work had been completed); https://techpartnerships.noaa.gov/wp-content/uploads/2021/07/DOC-SBIR-Mandatory-Training-Slides-and-Certification-Form.pdf (SBIR fraud includes misrepresentations concerning the use of funds expended, work performed, results achieved, or compliance with program requirements under a SBIR award).

213. The Government has successfully pursued a number of FCA cases against SBIR contractors who committed research fraud under circumstances similar to those alleged here. These include the following Department of Justice judgments and settlements.

214. ***United States ex rel Longhi v. Lithium Power Techs., Inc***., 575 F.3d 458 (5th Cir. 2009). Government intervened and was awarded $5 million on summary judgment in FCA *qui tam* case where relator alleged 12 different types of technical research fraud against the United States Army, NASA, the United States Air Force, the Bureau of Missile Defense, the Office of the Secretary of Defense, and similar allegations involving the National Institute of Standards and Technologies and the Department of Energy. See also Testimony of Alfred J. Longhi, Jr. before the Committee on Commerce, Science, and Transportation, United States Senate, One Hundred Eleventh Congress, First Session, August 6, 2009.

215. ***United States v. Anghaie***, 633 F. App'x 514 (11th Cir. 2015). Government obtains summary judgment against SBIR contractor that, among other things, plagiarized research results from doctoral student thesis.

216. **Hart Scientific Consulting International LLC** ***(D. New Mex.).*** Two SBIR contractors settle allegations they violated the FCA by submitting demands for the monthly installment payments, despite knowing that the telescope they were supposed to fabricate

//

for the Air Force Research Laboratory would not be delivered in accordance with the applicable contract terms.

## TIMESHEET FRAUD MATERIALITY

217. The Government has repeatedly made clear to the public that it is vital to ensure that SBIR participants have DCAA-compliant accounting systems and that they provide information on the SF 1408 that is accurate and complete and that aligns with the information provided in the SBIR proposals. See, e.g., DARPA SBIR/STTR Contracting FAQs; DCAA Pre-Award Survey of Prospective Contractor Accounting System Checklist; DCAA Real-Time Labor Evaluations PowerPoint; DCAA Manual No. 7641.90; and SBA Small Business Innovation Research (SBIR) and Small Business Technology Transfer (STTR) Program Policy Directive.

218. The Government has further warned that errors on the SF 1408 form can result in a variety of penalties, depending on the nature and severity of the error. Potential penalties can include rejection or delay in the award, ineligibility for future contracts, overpayment financial penalties, and potential legal action if the errors are deemed to be fraudulent or criminal. Id.

219. Proper labor cost accounting and employee time tracking and recording are key aspects of a DCAA-compliant accounting system.

220. The fact that DCAA conducts surprise onsite audits of such labor cost and employee time accounting systems in and of itself establishes that falsely describing and certifying these items on the SF 1408, deceiving Government representatives during onsite labor cost and employee time systems audits and falsifying hours spent on SBIR contracts, all of which occurred at CHROMOLOGIC, is material to the Government.

221. The Government has successfully pursued a number of FCA cases against SBIR contractors who committed timesheet fraud under circumstances similar to those alleged here. These include the following six Department of Justice settlements.

222. **Combustion Research and Flow Technology, Inc. (E.D. Pa.).** Company agreed to pay $192,586 for failing to accurately account for PIs' time.

223. **EMP (D. Del.)**. Company and CEO agreed to pay $2.75m where, in addition to a second theory of liability, defendants directed company employees, or caused others to direct company employees, to falsely complete timesheets for direct labor that the employees did not perform and submit false invoices and public vouchers to the funding agencies for direct labor that was not performed on these contracts and grants.

224. **Sand 9 (E.D. Va.)** Company agreed to pay $625k where the company misrepresented the integrity of its accounting and timekeeping systems to obtain the grants and failed to maintain complete timekeeping records for its employees while receiving grant funding for labor.

225. **Aquasent (D. Conn.).** Company and individual officials agreed to pay $400k where, among other things, company: made misrepresentations to NSF prior to the award of the Phase II grant, including the submission of a false FMSQ purporting to detail, among other matters, Aquasent's time and effort policies and procedures, including the maintenance of bi-weekly timesheets; made misrepresentations to NSF during the conduct of the Phase I and Phase II grants that resulted in the release of incremental funding, including false certifications as to the Phase I principal investigator's primary employment with Aquasent and the submission of Phase II project reports misrepresenting that the funds expended on time and effort were supported by timesheets or other time and effort documentation; and made misrepresentations to NSF's Office of Inspector General ("OIG") in connection with its investigation about the submission of multiple false timesheets in response to OIG's requests and subpoenas.

226. **Agave (N.D.N.Y.)**. Company paid $300k to settle allegations that former president created two false timecards for one family member, namely his daughter, which claimed that his daughter had performed work on a government contract when in fact she had not. And submitted the false timecards to the Department of Defense. Also, Agave claimed it had incurred salary expenses for other family members, when these family members had not performed work to the extent claimed by Agave. Agave submitted the false and inflated salary expenses to the Department of Defense, which relied upon them

in calculating the monies that would be paid to Agave, regarding approximately 44 contracts with the U.S. Army, Navy, Air Force, and Defense Threat Reduction Agency.

227. **Advanced Thermal (D. Mass.).** Company and President/COO agreed to pay $100k for falsely certifying to NSF and DOE that: (1) company maintained an adequate financial system to account for the award funds as required by regulations, (2) company would comply with the award terms and conditions, and (3) company spent the award funds and performed the research in accordance with the terms and conditions. These certifications were false because company and officer failed to prepare and maintain documentation substantiating that they used the funds for the awarded research projects, and, on occasion, that they claimed and received funds for NSF projects that were already completed. Note: while not specifically relating to timesheet fraud, the false certification that company maintained an adequate financial system generally applies equally to Chromologic's certifications that it created and maintained the required timesheet accounting system.

228. **Agiltron, Inc. (D. Mass.).** Company and CEO agreed to pay $2.25 million for engaging in a scheme in which they directed and allowed employees to charge labor hours to the awards, even when those hours did not correspond with the employees' actual time and effort. Defendants also directed and allowed employees to alter their completed timesheets, with the goal of maximizing charges to each grant or contract. Additionally, Defendants directed and allowed employees to discard or destroy documents instructing them on how many hours to charge or change on their timesheets.

## RESEARCH FRAUD SCIENTER

229. RELATOR JOHNSON observed DEFENDANT MENON in the "desk space" at CHROMOLOGIC's offices laughing and saying, in sum and in substance that he was favorably impressed with the quality of fake data that had been submitted to the Government and followed this up by saying, he regretted wasting so much money on lab work when it was easier and cheaper to simply make up the data.

//

230. Rogers openly discussed "reprocessing" data with CHROMOLOGIC scientists. Relators understood "reprocessing" data to mean fabricating data.

231. Former CHROMOLOGIC employee Louis Chin Jones, Ph.D. (Senior Scientist) raised objections to the Research Fraud scheme and was terminated by MENON.

232. The following current and former CHROMOLOGIC employees raised objections to the Research Fraud scheme and were reprimanded by MENON, but not terminated: Virginio Sannibale, Ph.D. (Senior Researcher, Industrial Solutions Group); Katherine Fisher, Ph.D. (Lead Bioinformaticist); Wangzhong ("Wang") Sheng, Ph.D. (Research Scientist); Jaw Chyng Lormen Lue, Ph.D. (Senior Research Scientist); Agnes Lukaswicz, Ph.D. (Lead Scientist); Mark Starbird (Bioengineer); Thomas Miller (Bioengineer), and RELATOR JOHNSON.

233. The following former CHROMOLOGIC employees quit their jobs in protest of the Research Fraud scheme: Katherine Fisher, Ph.D. (Lead Bioinformaticist); Jaw Chyng Lormen Lue, Ph.D. (Senior Research Scientist); Agnes Lukaswicz Ph.D. (Lead Scientist); and RELATOR JOHNSON.

234. RELATOR JOHNSON had had conversations with the following CHROMOLOGIC employees who indicated they knowingly participated in the Research Fraud scheme:

a. Wangzhong Sheng.
b. Katherine Fisher.
c. Agnes Lukaszewicz.
d. Louis Chin Jones.
e. Thomas Miller.
f. Mark Starbird.

## TIMESHEET FRAUD SCIENTER

235. The following current and former CHROMOLOGIC employees raised objections to the Timesheet Fraud scheme and were reprimanded by MENON, but not terminated: Ross Steinberg, Ph.D. (Senior Associate), Evan Tsang (Head of Engineering),

Agnes Lukaswicz Ph.D. (Lead Scientist); RELATOR JOHNSON, and RELATOR YAE.

236. RELATOR JOHNSON or RELATOR YAE had conversations with the following CHROMOLOGIC employees who indicated they knowingly participated in the Timesheet Fraud scheme:

a. Wangzhong Sheng.
b. Katherine Fisher.
c. Agnes Lukaszewicz.
d. Edward Burns.
e. Lormen Lue.
f. Louis Chin Jones.
g. Ross Steinberg.
h. Esmaeil Heidari.

**COUNT I**

**RESEARCH FRAUD -FALSE CLAIMS**

**(31 U.S.C. §§ 3729(a)(1)(A)**

237. RELATORS reallege all the allegations in this complaint as if fully set forth herein.

238. This is a claim for treble damages and penalties under the FCA, 31 U.S.C. § 3729(a)(1)(A).

239. In connection with the foregoing scheme to commit Research Fraud, DEFENDANTS knowingly (as "knowingly" is defined by 31 U.S.C. 3729(b)(1)) presented or caused to be presented false or fraudulent claims for payment or approval to the United States.

240. Such false claims were material to the United States' decision to provide SBIR grant funds to CHROMOLOGIC on behalf of MENON.

241. By virtue of these false or fraudulent claims, the United States incurred damages in an amount to be proved at trial.

//

**COUNT II**

**RESEARCH FRAUD -FALSE STATEMENTS**

(31 U.S.C. §§ 3729(a)(1)(B)

242. RELATORS reallege all the allegations in this complaint as if fully set forth herein.

243. This is a claim for treble damages and penalties under the FCA, 31 U.S.C. § 3729(a)(1)(B).

244. In connection with the foregoing scheme to commit Research Fraud, DEFENDANTS knowingly (as "knowingly" is defined by 31 U.S.C. 3729(b)(1)) made, used, or caused to be made or used, false records or statements material to false or fraudulent claims paid or approved by the United States.

245. By virtue of these false records and statements, the United States incurred damages in an amount to be proved at trial.

**COUNT III**

**TIMESHEET FRAUD – FALSE CLAIMS**

**(31 U.S.C. §§ 3729(a)(1)(A)**

246. RELATORS reallege all the allegations in this complaint as if fully set forth herein.

247. This is a claim for treble damages and penalties under the FCA, 31 U.S.C. § 3729(a)(1)(A).

248. In connection with the foregoing scheme to commit Timesheet Fraud, DEFENDANTS knowingly (as "knowingly" is defined by 31 U.S.C. 3729(b)(1)) presented or caused to be presented false or fraudulent claims for payment or approval to the United States.

249. Specifically, DEFENDANTS received SBIR grant funds through knowingly false statements.

250. Such false claims were material to the United States' decision to provide SBIR grant funds to CHROMOLOGIC on behalf of MENON.

251. By virtue of these false or fraudulent claims, the United States incurred damages in an amount to be proved at trial.

**COUNT IV**

**TIMESHEET FRAUD – FALSE STATEMENTS**

**(31 U.S.C. §§ 3729(a)(1)(B)**

252. RELATORS reallege all the allegations in this complaint as if fully set forth herein.

253. This is a claim for treble damages and penalties under the FCA, 31 U.S.C. § 3729(a)(1)(B).

254. In connection with the foregoing scheme to commit Timesheet Fraud, DEFENDANTS knowingly (as "knowingly" is defined by 31 U.S.C. 3729(b)(1)) made, used, or caused to be made or used, false records or statements material to false or fraudulent claims paid or approved by the United States.

255. By virtue of these false records and statements, the United States incurred damages in an amount to be proved at trial.

**PRAYER FOR RELIEF**

WHEREFORE, RELATORS, each on behalf of himself, and on behalf of and in the name of the United States, demands judgment against CHROMOLOGIC and MENON as follows:

On Counts I, II, III and IV, under the False Claims Act:

1. Ordering CHROMOLOGIC and MENON to cease and desist from violating the FCA, 31 U.S.C. §§ 3729 *et seq*.
2. A money judgment against CHROMOLOGIC and MENON in the amount of three times the damages the United States has sustained because of DEFENDANTS' actions, plus a civil penalty for each act by CHROMOLOGIC in violation of the FCA, as provided by 31 U.S.C. § 3729(a).
3. Awarding RELATORS the maximum relator's share available under the FCA, for bringing Count I, namely, 30 percent of the proceeds of the action by judgment

or settlement of the claim since the Government declined to intervene, as provided in 31 U.S.C. § 3730(d).

4. Awarding RELATORS all reasonable expenses that were necessarily incurred in prosecution of this action, plus all reasonable attorneys' fees and costs, as provided by 31 U.S.C. § 3730(d); and

5. Interest on money judgments, as provided by law; and

6. For such other relief for the United States and RELATORS as the Court deems appropriate.

**JURY DEMAND**

Pursuant to Federal Rule of Civil Procedure 38, RELATORS hereby demand trial by jury.

Dated: September 18, 2024

Respectfully submitted,

KLEIMAN RAJARAM

By: /s/Mark Kleiman
Mark Kleiman (SBN 115919)
12121 Wilshire Blvd., Ste. 810
Los Angeles, CA 90025
310-392-5455
mark@krlaw.us

McINNIS LAW

By: /s/Timothy J. McInnis
Timothy J. McInnis
*(pro hac vice)*
521 Fifth Avenue, 17th Floor New York, NY 10175
Tel: (212) 292-4573
Fax: (212) 292-4574
Email: tmcinnis@mcinnis-law.com

*Attorneys for Relators*